# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 15, 2008         Decided July 22, 2008

No. 07-1051

EDMUND CHEIN, M.D.,
PETITIONER

v.

DRUG ENFORCEMENT ADMINISTRATION *ET AL.*,
RESPONDENTS

---

On Petition for Review of an Order of the
United States Drug Enforcement Agency

---

*Jonathan W. Emord* argued the cause for the petitioner. *Charles M. Sevilla* was on brief.

*Teresa A. Wallbaum*, Attorney, United States Department of Justice, argued the cause for the respondent.

Before: SENTELLE, *Chief Judge*, and HENDERSON and RANDOLPH, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge:* Edmund Chein (Chein) seeks review of the revocation of his practitioner's registration and the denial of his application for a

registration to export Schedule III non-narcotic and Schedule IV controlled substances—both actions taken by the United States Drug Enforcement Administration (DEA). The DEA Deputy Administrator (DA) found that it was not in the public interest to renew Chein's practitioner's registration or to grant him an export registration because he provided several undercover agents with anabolic steroids to enhance athletic performance; committed a number of record keeping violations; ordered controlled substances using an unauthorized DEA registration number; illegally imported controlled substances from an unregistered Mexican pharmacy and illegally shipped controlled substances to hundreds of overseas patients without a DEA export registration. Moreover, the DA found that Chein continued to dispense controlled substances even after his DEA registration had been suspended and continued to export controlled substances even after being informed by DEA that it was illegal to do so. For the reasons set forth below, we deny his petition.

## I.

Chein is the owner of the Palm Springs Life Extension Institute (PSLEI) in Palm Springs, California. He is a physician, having graduated in 1980 from the American University of the Caribbean School of Medicine. He also holds a law degree. Edmund Chein, M.D.; Revocation of Practitioner's Registration, Denial of Application for Exporter's Registration, 72 Fed. Reg. 6580, 6582 (Feb. 12, 2007). Chein is licensed to practice medicine in California and in Utah and was, before the proceeding under review, registered with DEA to dispense controlled substances (Schedules II through V). *See* Gov't Ex. (GX) 2. Chein purports to be "one of the world's leading authorities in the field of anti-aging medicine." Chein Br. 8. He believes that "every adult experiences hormone level reductions over time and those reductions coincide with outward and

inward signs of aging." *Id.* Chein claims that "through gradual increases in hormones to those approximating youthful levels, along with exercise and diet modification, individuals can slow the process of aging and delay the onset of, or prevent, age-related conditions." *Id.* This is accomplished through the "administration of very low doses of hormones over an extended period of time, accompanied by continued monitoring of baseline hormone levels until they slowly rise to approximate levels of a healthy young adult." *Id.* at 9. Chein calls the practice "total hormone replacement therapy." (THRT). *Id.* at 8. According to Chein, THRT differs from traditional gastroenterology in that "[a physician] administers hormones when they are less than those common in people of comparable age; [in] THRT, by contrast, [a physician] administers hormone[s] when levels drop below those of a typical healthy young adult." *Id.* at 8–9. He asserts that "[n]o patient has ever complained" about his practice. *Id.* at 9.

Chein has had a tense history, however, with the California Medical Board (CMB), DEA and law enforcement in general.[1] The CMB has taken action against Chein's medical license three times. In 1995, the CMB revoked Chein's license, stayed the revocation and put him on probation for "failing to obtain a . . . business license and for falsely advertising himself as a

---

[1]In 1996, Chein was convicted in California state court of three counts of criminal perjury for exaggerating his qualifications as an expert witness in two civil lawsuits, *see* In re Edmund Chein, M.D., No. 02-9, 02-43, Recommended Findings of Fact, Conclusions of Law, and Decision of the Administrative Law Judge (July 28, 2005) (ALJ Dec.) ¶ 48; GX 33; Tr. 221. Chein sought habeas corpus relief in district court, *id.*, and the Ninth Circuit reversed the district court's denial of Chein's petition. *Chein v. Shumsky*, 373 F.3d 978, 993 (9th Cir. 2004) (en banc).

physician and lawyer when he had never obtained a license to practice law." *Chein v. Med. Bd. of Cal.*, No. 00CS00319, at 4 (Cal. Super. Ct. Nov. 9, 2000); GX 125. In 2000 the CMB again revoked Chein's medical license, charging that he had "prescribed human growth hormone for a patient without medical indication and . . . had made false and misleading statements in certain publications and advertisements about hormone replacement therapy." *Id.* at 1. Chein challenged the revocation in state court and was successful in part. *Id.* at 17. The CMB and Chein ultimately entered into a settlement agreement revoking Chein's license, staying the revocation and suspending Chein from the practice of medicine for 10½ months "with credit for 10½ months already served." GX 113, at 4; GX 125, at 2.

In 2002, the CMB initiated a third disciplinary action against Chein alleging, *inter alia*, that he had "prescrib[ed] . . . [human growth hormone] without a good faith examination and medical indication," "fail[ed] to maintain adequate and accurate records," "obtained controlled substances by deceit, misrepresentation and subterfuge" and "dispensed controlled substances without proper privileges." In re Edmund Chein, M.D., No. 19-2000-107723, Accusation ¶¶ 18, 21–23, 31 (filed Aug. 15, 2002). The CMB and Chein eventually settled this dispute as well, noting that the settlement "[was] intended to resolve," in addition to the CMB's disciplinary action, "any disciplinary action taken by another state or the federal government based on the conduct alleged in the [August 15, 2002 Accusation]." In re Edmund Chein, M.D., No. 19-2000-107723, Stipulated Settlement & Disciplinary Order 2-3 (filed Sept. 22, 2005). Under the settlement, the CMB revoked Chein's medical license, stayed the revocation and placed Chein

on probation for five years.[2]

Chein has also had a long history with DEA. In 1994 and 1995, investigators from DEA, the Food and Drug Administration (FDA) and the United States Customs Service (Customs) conducted a series of undercover visits to PSLEI. During the visits Chein dispensed and prescribed Human Growth Hormone (HGH) and anabolic steroids[3] to the investigators ostensibly to improve athletic performance.[4] On

---

[2]The settlement occurred after the DEA Administrative Law Judge (ALJ) issued her recommendation in this case, *see* ALJ Dec. ¶ 55, but the DA noted it in her decision. *See* Chein, 72 Fed. Reg. at 6583 n.4 (citing 5 U.S.C. § 556(e)).

[3]An anabolic steroid is a Schedule III controlled substance. *See* 21 U.S.C. § 812(c) (Schedule III). While HGH is not included as a scheduled controlled substance, *see id.*; *see also* 72 Fed. Reg. at 6582 n.3, federal law prohibits knowingly distributing, or possessing with intent to distribute, HGH for any use in humans except as authorized by the Secretary of the United States Department of Health and Human Services and pursuant to a physician's order. 21 U.S.C. § 333(e).

[4]The first visit occurred on September 9, 1994. Brannon Affidavit ¶ 18. An undercover FDA Special Agent (SA) visited Chein posing as a rugby player who wanted to "build up" to avoid injury. *Id.* ¶ 19(d). Chein informed the SA that he could use HGH to "build muscle, endurance, speed, strength and muscle mass," and that "[i]n the next decade, competitive sport athletes will be doing human growth hormone and natural testosterone." *Id.* ¶ 19(d)(ii), (vi). Chein drew blood from the SA to test HGH and testosterone levels; during the same office visit, and without knowing the blood test results, Chein dispensed HGH to the SA. *Id.* ¶ 19(e)-(h). He also provided a prescription for insulin syringes. *Id.* ¶ 19(f). Chein subsequently dispensed several additional shipments of HGH to the undercover SA

via Airborne Express. *Id.* ¶¶ 21–23.

On October 17, 1994, another FDA undercover SA visited Chein. The SA informed Chein that he "had experienced difficulties in putting on muscle mass while weight-lifting." *Id.* ¶ 25(d). He also told Chein that he had taken steroids previously "but wanted a safer alternative." *Id.* Chein informed the SA that "[t]he latest development in 'body-building science or medicine' involved both human growth hormone and natural testosterone administered through the skin by means of a patch or gel, both having a synergistic effect in building up lean muscle." *Id.* ¶ 25(d)(iii). Chein drew blood to test the SA's testosterone and HGH levels; again, during the same office visit, and without knowing the blood test results, Chein prescribed insulin syringes, testosterone gel and HGH for the SA. *Id.* ¶ 25(e)-(g).

On March 17, 1995, an undercover Customs SA visited Chein posing as a competitive weightlifter. *Id.* ¶ 36. The SA explained that "he was interested in human growth hormone for gaining strength for competitive powerlifting and gaining strength, had been taking Anadrol (an anabolic steroid), but wanted [HGH] because he was losing to guys who are 'on the juice.'" *Id.* ¶ 37(c). Chein told the SA that "[a]fter 1990, the whole body-building industry had switched to natural testosterone, and the 'new power lifting people use testosterone and HGH.'" *Id.* ¶ 37(d)(i). Chein claimed that the hormone treatments could "increase his capacity" by 75-100 lbs "within a month." *Id.* ¶ 37(d)(viii). Moreover, he informed the SA that "[t]he human growth hormone and testosterone would not show up in drug testing at competitions if [he] followed Chein's instructions." *Id.* ¶ 37(d)(iv). Again, Chein ordered a blood test, and, again, before the result was available, Chein gave the SA a vial of HGH and a prescription for testosterone gel, explaining "I would rather see you abuse this than abuse Anadrol." *Id.* ¶ 37(d)(vii).

On July 20, 1995, a DEA SA visited Chein posing as a power lifter training for the Olympics. *Id.* ¶ 38(c). Chein ordered a blood test for testosterone and HGH levels. *Id.* ¶ 38(d)(h). He explained

May 23, 1996, FDA obtained a search warrant for PSLEI. *See* Search Warrant 1, No. 96-1101 (May 23, 2006). FDA and DEA investigators who conducted the search seized various anabolic steroids. Tr. 132. Although DEA regulations require a registrant to maintain purchase records, an inventory and a dispensing log at his registered address; *see, e.g.*, 21 C.F.R. §§ 1304.03-.04, no such records were found during the search. Tr. 134.[5]

---

that the treatment was to be "[o]ff the record" because he "had a strict agreement with the U.S. Attorney's office not to give [HGH] to people who didn't need it or to simply help them 'build up strength' and that they would . . . 'handcuff [him]'" if he did. *Id.* ¶ 38(e)-(f). He then joked with the SA, "[i]f you are [a federal agent], I'm dead." *Id.* ¶ 38(e). Chein planned to put the SA on a regimen of four different hormones—testosterone, HGH, insulin and dehydroepiandrosterone (DHEA)—"all of which would help with weight lifting." *Id.* ¶ 38(c)(v). He further explained that the testosterone "would not show up in a drug test related to power lifting if [the SA] stopped taking [it] two days before" the test. *Id.* ¶ 38(c)(iv). Chein provided the SA with a one-month supply of HGH and prescriptions for the other hormones. He told the SA that, if the blood test result "came back low," he would ship additional HGH. *Id.* ¶ 38(c)(ii).

For his part, Chein argues that he did not improperly prescribe and/or dispense controlled substances to the undercover officers. He claims that "[a]thletes, particularly those who engage in endurance exercise training, commonly suffer from low testosterone levels" and that he provided HGH and testosterone to the investigators "[b]ased on each patient's respective descriptions of their physical regimens and complaints." Chein Br. 11-12.

[5]The record does not indicate that DEA took any disciplinary action against Chein following the undercover visits or the 1996 search. *Cf.* Tr. 113 (noting that investigations "never resulted in any kind of activity" by DEA).

On July 20, 2000, Chein applied to renew his DEA practitioner's registration. *See* GX 1. Because Chein's California medical license was revoked at the time, his application received close scrutiny. On January 31, 2001, DEA Diversion Investigator (DI) Doris DeSantis, accompanied by DI Linda Martin, visited PSLEI to interview Chein, inspect his clinic and review his records. Tr. 263. Chein was not there at the time and the two met instead with Darryl Garber—another physician practicing at PSLEI. Garber informed DI DeSantis that he could not provide the biennial inventory and dispensing logs because they were stored electronically and none of the employees on duty knew how to access PSLEI's computer system. *Id.* at 268–69. Another PSLEI employee informed DI DeSantis that the purchase invoices were stored off-site with PSLEI's accountant. *Id.* at 273. Garber was eventually able to provide only two invoices, both for the purchase of phentermine (a Schedule III controlled substance). *Id.* at 275-76. DI DeSantis informed Garber that DEA regulations require records to be readily available for inspection and copying and that invoices be stored on-site. *Id.* at 274; *see also infra* note 6.

Five days later, DI DeSantis and DI Martin returned to PSLEI to review the records that were not available during their earlier visit. *Id.* at 277. Again, Chein was not present. *Id.* at 279. Garber asked the investigators to wait while he retrieved the records. After two or three hours he returned with a one-page computer generated inventory report, *id.* at 281; GX 8, dispensing logs for phentermine and various forms of testosterone, *id.* at 284; GX 9-16, and four purchase invoices for phentermine, *id.* 331–33; GX 17.[6] The documents revealed

---

[6]DEA regulations provide that financial and shipping records (such as invoices and packing slips) may be kept off-site (e.g., with an accountant) *only* if the registrant has notified the DEA in writing of his

several irregularities.  DEA regulations require a registrant to maintain most records for two years "for inspection and copying" by DEA employees, 21 C.F.R. § 1304.04(a); however, the dispensing logs Garber produced covered only the seven-month period from July 1, 2000 to February 5, 2001.  *See* Tr. 286-87; GX 9-16.  In addition, the dispensing logs indicated that during the seven-month period, PSLEI physicians had dispensed controlled substances 317 times to patients in foreign countries, including France, Germany, Great Britain, Spain, Switzerland, China (Hong Kong), Indonesia, Japan, South Korea and Canada; *see* GX 10-12, 15, 16.  Neither Chein nor Garber had an export registration required to dispense overseas.  *See* GX 2; *see also* 21 U.S.C. §§ 957 & 958.  Moreover, some shipments went to countries where the products were illegal.  *See, e.g.*, GX 38(c) (Garber acknowledged that "[i]n Japan and Korea it is against

---

intent to do so.  21 C.F.R. § 1304.04(a).  Moreover, DEA regulations require that "[i]nventories and records of controlled substances listed in Schedule III, IV, and V shall be maintained either separately from all other records of the registrant or in such form that the information required is *readily retrievable* from the ordinary business records of the registrant."  *Id.* § 1304.04(f)(2) (emphasis added).  A "readily retrievable" record is "kept by [an] automatic data processing system[] or other electronic or mechanized recordkeeping system[] in such a manner that [it] can be separated out from all other records *in a reasonable time*."  *Id*. § 1300.01(b)(38) (emphasis added).  Chein challenged DI DeSantis's view of "readily retrievable" as "instantaneous" and the DA acknowledged that DI DeSantis applied the incorrect standard and, accordingly, did not use the 2-3 hour delay in her decision.  *See* 72 Fed. Reg. 6593 ("Respondent is correct that this regulation does not require that records be 'instantaneously produced.' . . .  Accordingly, there is no basis to conclude that the inventory and dispensing records were not readily retrievable . . . .") (citation omitted).

the law to prescribe Anabolic Steroids and Phentermine for the purpose of Anti-Aging Medicine." (citations omitted)); *see also* 21 U.S.C. § 953(e) (registered exporter required to file export declaration with DEA indicating "importation is not contrary to the laws or regulations of the country of destination" for each shipment).  The dispensing logs Garber produced indicated that PSLEI physicians regularly dispensed various forms of testosterone, *see* GX 9-16, but Garber did not provide any purchase invoices therefor.  Tr. 334.  Finally, the four phentermine purchase invoices indicated that PSLEI employees had been ordering the controlled substance with an unauthorized DEA registration number.  Each of the invoices contained the DEA registration number of Connie Chein, Chein's physician sister.  *See* GX 17.  Although Connie Chein owned PSLEI for approximately 10½ months during 2000 when her brother's California medical license was revoked,[7] she denied that she gave her brother permission to use her DEA registration or that she was aware that anyone at PSLEI had used her registration to

---

[7]Connie Chein bought PSLEI from her brother because under California law only a licensed physician can own a medical facility. *See* Tr. 1087 (testimony of Connie Chein).  Chein sold PSLEI to his sister around February 16, 2000—two days before the CMB revoked his medical license. *See* ALJ Op. ¶ 24.  After the court vacated the revocation, Connie Chein sold PSLEI back to Chein in December 2000.  Tr. 1087.  Although Connie Chein owned PSLEI during most of 2000, there is substantial record evidence indicating that Chein remained in control of PSLEI. *See, e.g.*, GX 28, at 14 (Connie Chein visited clinic only once); GX 96, at 32 (correspondence manifesting Chein's approval required prior to shipment of prescription); GX 105, at 36 (Chein ordered shipment of phentermine to patient in Japan); GX 107, at 23 (Chein ordered duplicate shipment of prescription); GX 136, at 14 (Chein described special handling requirements for shipments to Japan).

order controlled substances.  *See* GX 28.

On March 9, 2001, DI DeSantis telephoned Garber at PSLEI to inquire about the shipments of controlled substances listed in the dispensing logs outside the United States.  *See* Tr. 506–07. Garber confirmed that PSLEI was shipping controlled substances overseas.  *Id.* at 507; *see also* GX-25.  At that time DI DeSantis instructed Garber to immediately cease the shipments because no one at PSLEI had a DEA export registration.  *Id.* at 508.[8]  Later that day, PSLEI staff faxed DI DeSantis copies of purchase invoices for testosterone which had not been produced during her February 5, 2001 visit.  Tr. 516-18.  Again, the records appeared to be incomplete.  The earliest invoice was dated November 20, 2000, *see* GX 20(k); however, the dispensing records indicated that testosterone had been dispensed for several months before November 2000.  *See* GX. 15, at 23-26.[9]

On August 23, 2001, DI DeSantis and DI Violeta Willmont finally met with Chein.  Tr. 546-48.  Chein acknowledged not having a DEA export registration; however, he claimed that because he was shipping controlled substances directly to overseas physicians, he did not need an export registration.  *Id.* at 554.[10]  He told DI DeSantis that he had continued to export

---

[8]In April 2001, Chein applied for a registration to export Schedule III non-narcotic and Schedule IV controlled substances but neither that application nor a second one was ever processed.  GX 48; *see also* GX 39.

[9]At least one of the purchase invoices used Connie Chein's DEA registration number.  *See* GX 20(j).

[10]Chein's dispensing log indicates that, contrary to his claims, he shipped controlled substances directly to patients overseas.  *See, e.g.*,

controlled substances despite her earlier instruction to Garber. *Id.* at 557. Chein told DI DeSantis that he did not plan to stop exporting until "he received something in writing" from DEA. *Id.* at 558. He did not tell her that he had applied for an export registration. *Id.* at 658. During the meeting Chein provided her with additional purchase invoices for controlled substances. One of the invoices, dated June 26, 2001, was for the purchase of 120 units of Depo-testosterone and 40 units of Decadurabolin (both Schedule III controlled substances) from a pharmacy in Tijuana, Mexico. *See* GX 22; Tr. 573. Chein was not then (or since) registered with DEA as an importer. GX 2; Tr. 167. On August 31, 2001, DI DeSantis instructed Chein by fax that, because he was not registered to import or export controlled substances, he "must immediately cease all acitivity (sic) in these areas as previously instructed." *Id.*

On November 7, 2001, DEA issued an order to show cause requiring Chein to show why his practitioner's registration and his pending application for renewal should not be denied on the ground that his continued registration was inconsistent with the public interest under 21 U.S.C. §§ 823(f) and 824(a). GX 26. DEA also issued a notice of immediate suspension informing Chein that his registration was immediately suspended as an imminent danger to the public health and safety under 21 U.S.C. § 824(d). *Id.* DI DeSantis delivered both documents to PSLEI on November 12, 2001, Tr. 590, and, while there, inspected additional purchase invoices. One invoice dated March 26, 2001 indicated that two kilograms of testosterone had been purchased using Connie Chein's DEA registration. GX 45(a). Three invoices indicated that Garber had been receiving

---

GX 87 (dispensing log for testosterone gel showing shipments to patients in Japan).

shipments of testosterone at his home and not at his registered address (i.e., PSLEI) in violation of 21 U.S.C. § 822(e) and 21 C.F.R. § 1201.12. *See* GX 45(b), (c), (d) & (g).

Subsequently DI DeSantis conducted three "trash runs" (searching garbage left for collection) at PSLEI. Tr. 686. She found paperwork showing Chein continued to export controlled substances even after she had ordered him to cease further exporting. *See, e.g.*, GX 70 (Oct. 24, 2001 invoice for shipment of phentermine and testosterone to patient in Japan); GX 73 (Oct. 29, 2001 instruction, signed by Chein, ordering shipment of testosterone to second patient in Japan). Following these discoveries, DEA obtained an administrative inspection warrant for PSLEI. GX 82. DEA agents executed the warrant on March 13, 2002, seizing PSLEI's dispensing logs, patient records for approximately 100 overseas patients and samples of controlled substances. Tr. 721, 764, 811. The records showed that Chein regularly exported controlled substances for almost three months after DI DeSantis first instructed him to stop in August 2001, *see, e.g.*, GX 84-88, and that several of the exports took place even after Chein received DEA's notice of immediate suspension. GX 84, at 3-4 (noting eight exports by Chein on November 13, 2001 and five on November 14, 2001).

A DEA Administrative Law Judge (ALJ) held a hearing on January 28-February 6, September 9-10 and December 9-11, 2003. On July 28, 2005, the ALJ issued her recommended decision. In re Edmund Chein, M.D., No. 02-9, 02-43, Recommended Findings of Fact, Conclusions of Law, and Decision of the Administrative Law Judge (July 28, 2005) (ALJ Dec.). The 82-page decision concluded that Chein's continued registration was against the public interest and also recommended that his application for an export registration be denied. ALJ Op. 82. (Three years earlier, on May 24, 2002, DEA had issued a second order to show cause directing Chein

to show cause why his application for an export registration should not be denied.) *See* ALJ Op. 1. On February 12, 2007, the DA issued the final agency order revoking Chein's practitioner's registration and denying his pending export registration application. 72 Fed. Reg. at 6595. Chein then filed a timely petition for review pursuant to 21 U.S.C. § 877.

## II.

Chein raises a host of objections to the DA's analysis as well as to the procedure employed during the ALJ hearing.[11] We

---

[11]Chein raises the following objections:

1. The DA revoked his registration when she had not revoked other physicians' registrations in analogous circumstances, relying on *Morall v. DEA*, 412 F.3d 165, 167 (D.C. Cir. 2005). Chein Br. 26-29.

2. DEA improperly deviated from its "consistent practice of cooperating with physician registrants" for export registration by failing to communicate with him while his applications were pending and by not providing sufficient guidance during the application process. *Id.* at 29-33.

3. DEA improperly withheld documents from Chein and the ALJ by improperly invoking a law enforcement privilege. *Id.* at 34-35.

4. The DA erroneously concluded that Chein had imported controlled substances from a Mexican pharmacy despite evidence that the delivery was routed through a San Diego warehouse. *Id.* at 33-38.

5. The DA erred in holding Chein liable for violations of the Controlled Substances Act committed by other DEA registrants working at PSLEI. *Id.* at 39-41.

6. The DA incorrectly found that Chein violated the record-keeping requirements of 21 U.S.C. § 827(b)(2)(B). *Id.* at 41-45.

have considered all of Chein's objections on the briefs and at oral argument and conclude that only the first merits discussion. In *Morall v. DEA*, 412 F.3d 165 (D.C. Cir. 2005), we vacated DEA's revocation of a physician's registration because DEA had "consistently declined" "to revoke the registration of any other physician in a comparable context, or even under significantly more troubling circumstances" and because DEA offered "no explanation" for the departure from its precedent. *Id.* at 181.[12]  We first explained that under the Administrative

---

7. The DA improperly applied the "public interest" tests prescribed in 21 U.S.C. § 823(a) and (f) by giving insufficient weight to factors favorable to Chein. *Id.* at 45-52.

8. DEA violated due process by submitting evidence it had agreed not to submit and by offering the testimony of a substitute witness at the ALJ hearing. *Id.* at 52-56.

9. The DA erred in finding that Chein's shipments of controlled substances to overseas patients constituted a "diversion" of the substances "within the meaning of the CSA." *Id.* at 56-59.

[12]The DA's decision to revoke Morall's DEA registration was based "solely on . . . her alleged lying to investigators" and "her record-keeping failures." *Morall*, 412 F.3d at 180.  Regarding the DA's finding that Morall had lied to investigators, we found that the decision could "not withstand review because the [DA] entirely ignored relevant evidence" of Morall's truthfulness, including testimony "that the ALJ credited" without providing "any reason for rejecting the ALJ's decision to credit Dr. Morall's account." *Id.* at 178 (citing, *inter alia*, *El Rio Santa Cruz Neighborhood Health Ctr., Inc., v. United States Dep't of Health & Human Servs.*, 396 F.3d 1265, 1278 (D.C. Cir. 2005)) (emphasis omitted).  Moreover, the record-keeping failures the DA believed warranted revocation "occurred during a relatively brief time period" when Morall was struggling with several personal reversals. *Id.* at 168, 183.  Morall had also recently

Procedure Act, 5 U.S.C. § 706(2)(A), the DA's choice of sanction is entitled to substantial deference and will be set aside only if her decision is " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " *Id.* at 177 (quoting *Tourus Records, Inc. v. DEA*, 259 F.3d 731, 736 (D.C. Cir. 2001) (quoting 5 U.S.C. § 706(2)(A))). Ordinarily, the "mere unevenness in the application of [a] sanction [will] not render its application in a particular case 'unwarranted in law.'" *Id.* at 183 (quoting *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 188 (1973)) (first alteration in *Morall*). If the revocation represents a "flagrant departure from DEA policy and practice," however, and if the departure is "not only unexplained, but entirely unrecognized in the [DA's] decision, the agency's sanction [cannot] withstand abuse of discretion review." *Id.* at 183.

Addressing *Morall's* first factor, we believe Chein has failed to demonstrate that DEA has a *consistent* policy of allowing a practitioner to retain his registration under similar circumstances. The numerous cases in which Chein claims DEA has allowed more egregious violators to retain their registrations are easily distinguishable from his.[13] In each of the

---

split from her former business partner, been evicted from her clinic for non-payment of rent and had not been able to hire support staff. *Id.* When confronted with her record-keeping violations, Morall acknowledged her errors and "readily agreed to take classes to improve her record keeping." *Id.* at 183. We noted that "[n]owhere in its decision, in its brief to the court, or during the oral argument, did DEA identify a single case in which a physician's registration was revoked under analogous circumstances." *Id.* at 181.

[13]*See, e.g.*, Theodore Neujahr, D.V.M.; Continuation of Registration, 65 Fed. Reg. 5680 (Feb. 4, 2000) (no revocation of

veterinarian who kept controlled substances in unlocked drawer at unregistered location; "used his privileges as a DEA registrant to obtain controlled substances to support his chemical dependency"; and "materially falsified his . . . renewal applications"); Karen A. Kruger, M.D.; Grant of Restricted Registration, 69 Fed. Reg. 7016 (Feb. 12, 2004) (no revocation of physician who "unlawfully issued prescriptions [for] approximately 5,500 dosage units of . . . controlled substance[s]" and used falsified prescriptions to support her drug addiction); Jeffrey Martin Ford, D.D.S.; Grant of Restricted Registration, 68 Fed. Reg. 10,750 (Mar. 6, 2003) (no revocation of dentist who abused marijuana, LSD, mescaline and cocaine and had been convicted of drug offenses several years earlier); Wesley G. Harline, M.D.; Continuation of Registration With Restrictions, 65 Fed. Reg. 5665 (Feb. 4, 2000) (no revocation of physician who prescribed medication in violation of state law and "wr[ote] incomplete prescriptions"); Paul W. Saxton, Continuation of Registration, 64 Fed. Reg. 25,073 (May 10, 1999) (no revocation of physician who "prescribed large quantities of controlled substances to individuals who he knew or should have known abused the drugs"; illegally prescribed anabolic steroids to family members and could not "account for large quantities of drugs"); Donald P. Tecca, M.D.; Continuation of Registration With Restrictions, 62 Fed. Reg. 12,842 (Mar. 18, 1997) (no revocation of physician who eight times prescribed anabolic steroids "for no legitimate medical reason" and prescribed controlled substances to undercover agent with alleged drug problem); Mary Thomson, M.D.; Continuation of Registration With Restrictions, 65 Fed. Reg. 75,969 (Dec. 5, 2000) (no revocation of physician who abused opiates and obtained controlled substances by misrepresentation); Barry H. Brooks, M.D.; Continuation of Registration, 66 Fed. Reg. 18,305 (Apr. 6, 2001) (no revocation of physician whose state medical license was suspended and who was convicted of illegally prescribing Dilaudid for treatment of heroin addiction); Vincent J. Scolaro, D.O.; Grant of Restricted Registration, 67 Fed. Reg. 42,060 (Jun. 20, 2002) (no revocation of physician who abused controlled substances, lacked required records and had

cases, the DA, using the public interest standard, imposed a sanction less than revocation primarily because the practitioner had corrected the prohibited practices, accepted responsibility for his or her conduct, cooperated fully with DEA and, where applicable, sought treatment for drug or alcohol addiction underlying the violation.[14] Not so here. Chein cannot credibly

---

criminal conviction).

[14]*See, e.g.*, Neujahr, 65 Fed. Reg. at 5682 ("The [DA] finds it noteworthy that Respondent first sought treatment for his chemical dependency on his own and not at the direction of [DEA]."); Kreuger, 69 Fed. Reg. at 7017-18 ("The [DA] finds significant the Respondent's ready willingness to cooperate with law enforcement authorities . . . [and] to seek treatment for her drug abuse."); Ford, 68 Fed. Reg. at 10,753 ("Respondent beg[a]n attending drug rehabilitation following his . . . arrest, and has not abused controlled substances [during the intervening twelve years]."); Harline, 65 Fed. Reg. at 5672 ("Respondent has taken remedial steps to ensure that he practices in compliance with the law."); Saxton, 64 Fed. Reg. at 25,073 ("[Respondent] ceased such prescribing *immediately* upon learning that it was illegal and has not prescribed anabolic steroids for muscle enhancement since." (emphasis added)); Tecca, 62 Fed. Reg. at 12,846 (respondent acknowledged improper prescribing and testified he had since "become more conservative in his prescribing practices."); Thomson, 65 Fed. Reg. at 75,972 ("Respondent effectively has addressed the personal and professional problems that contributed to her drug abuse [and] take[n] affirmative responsibility for her misconduct . . . ."); Brooks, 66 Fed. Reg. at 18,309 ("Respondent has readily admitted fault, has taken responsibility for his past misconduct, and has fully cooperated with and assisted in the investigations concerning his illicit activities."); Scolaro, 67 Fed. Reg. at 42,066 ("Respondent has succeeded outstandingly in a well established, aggressive rehabilitation program . . . ."); *see also Morall*, 412 F.3d at 183 ("Morall has always acknowledged that her record

claim that he has cooperated with DEA given his continued exporting of controlled substances after he was repeatedly informed that it was illegal to do so, as well as his continued dispensing of controlled substances even after his DEA registration was suspended. Nor has Chein accepted responsibility for his misconduct as evidenced by, *inter alia*, his continued insistence that his dispensing of anabolic steroids to the undercover agents was proper and his providing misleading information to DEA investigators. *See supra* notes 4, 10. Moreover, we note that Chein engaged in a persistent course of misconduct which, at the time of the notice of immediate suspension, spanned at least seven years. *See Morall*, 412 F.3d at 183 (noting "Morall's record-keeping failures occurred during a relatively brief time period").[15] Because Chein has failed to demonstrate that his revocation represents a "flagrant departure from DEA policy and practice" in analogous cases, *Morall*, 412 F.3d at 183, we need not reach the question whether DEA

---

keeping suffered . . . and she readily agreed to take classes to improve her record keeping.").

[15]In fact, in several instances, DEA has revoked the registrations of physicians involved in comparable behavior. For example, in John W. Copeland, M.D.; Revocation of Registration, 59 Fed. Reg. 46,063, 46,064 (Sept. 6, 1994), the DA revoked the registration of a physician who had prescribed controlled substances (e.g., Ritalin, Valium, Restoril) to drug addicts and anabolic steroids for bodybuilding. In Rose Mary Jacinta Lewis, M.D.; Affirmance of Immediate Suspension, 72 Fed. Reg. 4035, 4038, 4041 (Jan. 29 2007), the DA revoked the registration of a physician who provided her DEA registration number to an associate so that he could use the number to order HIV medication to be sent to Nigeria. The physician understood the drugs were to be shipped overseas although neither she, nor her associate, had an export registration. *Id.*

adequately explained the departure. *Id.* Accordingly we deny the petition for review.[16]

*So ordered.*

---

[16]We note, however, the length of time DEA took to issue a final order in this case. It issued the first order to show cause on November 7, 2001; the DA's final order did not issue until January 19, 2007—over five years later. *See Wedgewood Vill. Pharmacy v. DEA*, 509 F.3d 541, 546, 547 (D.C. Cir. 2007) (noting with disapproval one-year delay between ALJ hearing and ALJ opinion and one-year delay between ALJ opinion and DA's final decision).