FILED
United States Court of Appeals
Tenth Circuit

**December 23, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

DEWEY C. MACKAY, M.D.,

Petitioner,

v.

DRUG ENFORCEMENT
ADMINISTRATION,

Respondent.

No. 10-9556

ON PETITION FOR REVIEW
OF A DECISION BY THE
DRUG ENFORCEMENT ADMINISTRATION
(DEA No. 09-28)

Peter Stirba (Nathan A. Crane and Miles W. Millard with him on the briefs) of
Stirba & Associates, Salt Lake City, Utah, for Petitioner.

Anita J. Gay, Attorney, United States Department of Justice, Criminal Division,
Narcotic and Dangerous Drug Section, Washington, D.C., for Respondent.

Before **BRISCOE**, Chief Judge, and **SEYMOUR**, and **LUCERO**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Dewey C. MacKay, M.D., petitions for review of a decision of the Deputy Administrator of the Drug Enforcement Administration ("DEA") revoking his registration to dispense controlled substances and denying all pending requests for renewal or modification.[1] *Dewey C. MacKay, M.D.*, 75 Fed. Reg. 49,956 (DEA Aug. 16, 2010). Because the DEA's decision is supported by substantial evidence and is not arbitrary or capricious, we deny the petition.

**I.**

Dr. MacKay is a medical doctor who, at the time of the underlying proceedings, held a DEA certificate of registration that authorized him to dispense controlled substances in schedules II through V.[2] He also held a physician's license issued by the State of Utah and has been a board-certified orthopedic surgeon for over thirty years.

Around 2001, Dr. MacKay underwent cardiac bypass surgery. Thereafter,

---

[1] The Controlled Substances Act requires persons who dispense controlled substances to obtain proper registration from the Attorney General. *See* 21 U.S.C. § 822(a)(2). The authority to deny, revoke, or suspend administrations has been delegated to the Administrator of the DEA, *see* 21 U.S.C. § 824; 28 C.F.R. § 0.100(b), and redelegated to the Deputy Administrator, *see* 28 C.F.R. § 0.104 & App. § 12.

[2] The Controlled Substances Act classifies controlled substances in five schedules. Substances in schedules II through V have accepted medical uses in the United States and may be dispensed (prescribed) by physicians registered with the DEA. *See* 21 U.S.C. § 812. Drugs in lower numbered schedules have a higher abuse potential. *See id.* Updated schedules of controlled substances are published in the Code of Federal Regulations. *See* 21 C.F.R. §§ 1308.11-.15.

he gradually reduced the number of surgeries he performed, until he stopped performing surgeries altogether around 2006. As Dr. MacKay decreased his orthopedic surgical practice, he began treating chronic pain patients. By 2007, approximately eighty-five percent of his practice involved pain patients. This case concerns his prescribing behavior from 2005 to early 2009, when his practice focused primarily on chronic pain management.

## A.

The DEA began investigating Dr. MacKay after receiving information from local authorities that he was issuing unlawful prescriptions for controlled substances. As part of this investigation, the DEA interviewed several of Dr. MacKay's former patients and executed search warrants on his office in June 2008 and January 2009, seizing patient records and related documents. In addition, the DEA gained cooperation of patients M.R. and K.D., both of whom agreed to record undercover visits with Dr. MacKay. They recorded a total of eight in-person visits and one phone call with Dr. MacKay, from October 2007 to December 2008.[3]

On February 26, 2009, the Deputy Administrator of the DEA issued an order to show cause why the DEA should not revoke Dr. MacKay's registration

---

[3] In particular, M.R. recorded visits on October 9, November 27, December 24, 2007, and January 29, 2008. K.D. recorded visits on November 3, November 24, December 1, and December 22, 2008, and a phone call on November 20, 2008.

on the ground that his continued registration is inconsistent with the public interest. *See* 21 U.S.C. §§ 823(f); 824(a)(4). The order stated that Dr. MacKay's registration would be immediately suspended, pending the show cause proceedings.[4]

The order to show cause alleged that from "June 2005 to the present," Dr. MacKay "issued numerous purported prescriptions for controlled substances without a legitimate medical purpose and outside the usual course of professional practice." *MacKay*, 75 Fed. Reg. at 49,956 (quoting Order to Show Cause at 1-2) (internal quotation marks omitted). As factual support, the order asserted, among other things, that Dr. MacKay had issued prescriptions for controlled substances to a patient even after she told him she shared her prescription drugs with another person, had exchanged prescription drugs for sexual favors, had issued prescriptions for controlled substances without a legitimate medical purpose and without conducting appropriate diagnostic evaluations, and had been prescribing extraordinarily large amounts of highly addictive opioids.

Dr. MacKay filed a motion for a temporary restraining order in federal district court, seeking reinstatement of his registration. After holding a hearing, the district court stayed the immediate suspension of Dr. MacKay's registration

---

[4] The Controlled Substances Act authorizes immediate suspension of a physician's registration at the commencement of show cause proceedings if the DEA finds "there is an imminent danger to the public health or safety." 21 U.S.C. § 824(d).

-4-

pending a final administrative decision on the underlying order to show cause. Based on the limited evidence then in the record, the court held the DEA had not demonstrated that Dr. MacKay's continued registration would result in "imminent danger to public health or safety," as required for immediate suspension. *See* 21 U.S.C. § 824(d).

**B.**

After the district court issued its order, an administrative law judge ("ALJ") held a hearing at which both sides presented evidence. The DEA's evidence included testimony of cooperating patients M.R. and K.D., audio-recordings and transcripts of their undercover conversations with Dr. MacKay, medical records of several patients, and testimony of Dr. Bradford Hare, a medical expert.

M.R. was Dr. MacKay's patient from May 2004 through January 2008. When she began seeing Dr. MacKay, it was for "wrist pain." Later her complaints shifted to "back pain." However, she testified that her pain complaints were fabricated. Instead, she went to see Dr. MacKay to obtain prescriptions for Lortab to use for recreational purposes. According to M.R., Dr. MacKay conducted no examination on her first visit, except for feeling her wrist for about ten seconds. Similarly, when she feigned back pain, the extent of Dr. MacKay's examination was to ask her to bend over and stand up again. He never ordered any tests or X-rays to diagnose or verify her claimed ailments. M.R. explained that during her appointments, she was not asked to discuss her pain at

all before Dr. MacKay gave her prescriptions for controlled substances. She

mentioned her pain to him only two or three times over several years. Yet she

consistently received prescriptions for controlled substances including Lortab,

Valium, and Xanax.

M.R.'s recorded undercover appointments corroborate her testimony.

During her first such appointment, M.R. was accompanied by an undercover DEA

agent posing as her friend, "Rebecca." Rebecca and M.R. attempted to obtain a

Lortab or OxyContin prescription for Rebecca. Dr. MacKay refused to write a

prescription for her without a referral from her doctor and an appointment. The

entire appointment focused on whether Dr. MacKay would write a prescription for

Rebecca; there was no discussion of M.R.'s pain or medical condition.

Nevertheless, M.R. emerged from the appointment with a prescription for ninety

Lortab with a refill.

During M.R.'s second undercover visit, Dr. MacKay asked her, "How are

you today?" She replied, "Good. How are you?" Dr. MacKay did not ask any

questions about her pain, but said, "You want a refill again?" She replied,

"Yeah." *MacKay*, 75 Fed. Reg. at 49,965.[5] During this appointment, M.R. told

_____

[5] The administrative record was submitted to this court with a motion to
seal the documents and exhibits contained therein because the documents reveal
medical records and private personal information about Dr. MacKay's patients.
The unopposed motion was provisionally granted. We now permanently grant the
motion and allow the administrative record to remain under seal. Because the
administrative record is sealed, we instead quote from the Deputy Administrator's
(continued...)

Dr. MacKay that she had shared some of her drugs with Rebecca. She asked him whether that was "okay to do." Dr. MacKay told her that was "against the law. . . . Just don't, uh, don't tell me about it." *Id.* Despite knowing that she was diverting drugs, Dr. MacKay gave her another prescription for ninety Lortab with one refill.

At M.R.'s third undercover appointment, Dr. MacKay told her that although he had been seeing her about once a month, she needn't come back for two months because he was going to give her a prescription and a refill. He then asked her, "Lortab ten?" M.R. replied, "Yeah." *Id.* After the sound of paper tearing from a pad, Dr. MacKay asked her, "You been doing okay?" M.R. said, "Yeah. I'm doing good." *Id.* There was no discussion of M.R.'s pain or the efficacy of her medication and no physical examination. She left the appointment with a prescription for ninety Lortab and a refill.

M.R.'s fourth undercover visit was about a month later. Dr. MacKay began the appointment by asking how she was doing. She replied, "Good. How are you?" He said, "Good," then asked her, "Lortab ten #90?" *Id.* After she said yes, he also asked her if she wanted a refill, to which she again replied, "Yes." Dr. MacKay asked M.R. whether she was "getting pills from any other doctor," and whether she was "abusing them, selling them, buying them" or "doing

_____

[5](...continued)
decision, which is not sealed. In so doing, we omit all internal quotation marks.

anything illegal?" *Id.* (alteration omitted). She said she was not. He did not mention that she had come back a month earlier than she was supposed to. He did not inquire about her pain, nor does the transcript suggest a physical exam was performed. Nevertheless, M.R. again emerged from the appointment with a Lortab prescription and a refill.

Dr. Hare, the DEA's expert witness, reviewed the transcripts of M.R.'s recorded appointments. As he testified, M.R.'s appointments were more social than medical with little, if any, discussion of her medical condition. Dr. Hare compared the transcripts of M.R.'s undercover visits with her patient records for those appointments. He explained that although the medical records indicated physical examinations were conducted during her appointments, it appeared from the transcripts that no such exams occurred.

According to Dr. Hare, although the usual course of professional practice requires a physician to document the justification for switching between controlled substances, Dr. MacKay failed to provide such justification when changing M.R.'s prescriptions. Dr. Hare testified that Dr. MacKay's records were superficial, with little useful information beyond the nature of her complaint. They did not even indicate whether his treatment improved her condition. Dr. Hare also noted that documents in M.R.'s file show Dr. MacKay was aware she was receiving duplicate prescriptions for controlled substances from another doctor, suggesting M.R. was overusing or abusing her medication. Despite these

indications of diversion, Dr. Hare saw no changes in Dr. MacKay's prescribing practices to address the problem. In Dr. Hare's view, M.R.'s medical records did not "support the long-term prescribing of controlled substances" to M.R. *Id.* at 49,966.

K.D. was Dr. MacKay's patient beginning in November 2004. K.D. testified that she had a legitimate pain condition when she began seeing Dr. MacKay for a neck injury, but she said Dr. MacKay performed no tests or X-rays to diagnose her neck pain.[6] Other than a brief examination during her first appointment, he never performed another physical exam on her. According to her testimony, after the first appointment if her pain was discussed at all, it was because she raised the subject. She testified that she was addicted to pain medication and that ninety percent of the medication she received from Dr. MacKay was for recreational use.

K.D. also testified that Dr. MacKay engaged in sexual activities with her on multiple occasions. For their first encounter, he asked her to meet him at a motel room, where he gave her a topless massage and then wrote her a prescription for a controlled substance. The government presented a receipt showing Dr. MacKay's payment for the motel room to corroborate K.D.'s account. K.D. testified that she

---

[6] This statement was contradicted by evidence in her medical record indicating that Dr. MacKay took an X-ray of K.D.'s neck in 2004 to evaluate her initial complaint of neck pain.

and Dr. MacKay met four or five other times at her friend's house. During these encounters, he gave her topless massages and once digitally penetrated her; he also gave her prescriptions for controlled substances and, on some occasions, money for filling the prescriptions.

The recordings of K.D.'s appointments with Dr. MacKay reflect a lack of evaluation of her medical needs. At the first undercover visit, K.D. told Dr. MacKay that she had "been in a lot of pain." Dr. MacKay responded only by commenting, "I'll bet you have," *id.* at 49,968, and by asking her what drugs she wanted. She recited the drugs and quantities she wanted. No further inquiries were made into how well her medication was working, whether the source or severity of her pain had changed since her last appointment, or any side effects she might be experiencing. Instead, Dr. MacKay expressed concern that he was under investigation by the DEA and asked her if she was a plant from the police or the DEA. He told her the DEA had "actually sent people in with wires." *Id.* at 49,969. Despite knowing the DEA was investigating his office, Dr. MacKay gave K.D. prescriptions for 90 tablets of OxyContin 40 mg., 120 tablets of oxycodone 30 mg., 30 tablets of Ambien, and 60 tablets of Fioricet.

Three weeks later, on November 24, 2008, K.D. returned for another appointment, which was also recorded. After she discussed problems she had encountered filling a prescription, which she ultimately received in its entirety, Dr. MacKay explained that he could not write a refill for her "less than four

-10-

weeks" after her last visit, or before December 1.  *Id.*  He told her he would give her sixty oxycodone to carry her through Thanksgiving, and she could come back December 1 for the rest.  He promised not to bill her for the next appointment. He then asked her "And you're not working with the DEA, or wearing a wire, right?"  *Id.*  She said she was not.  During the rest of the appointment, they discussed the DEA investigation and Dr. MacKay's dispute with his former business partner.  There is no indication he performed an exam or asked any questions about K.D.'s pain.

K.D. returned on December 1, 2008.  Dr. MacKay asked what she needed, and she replied, "Everything.  My OxyContin, my Roxicet, my Fioricet, my Ambien, and I have been so stressed out, so I was going to see if I could get some Xanax, too."  *Id.*  Dr. MacKay asked her how many Xanax she wanted.  They decided thirty would be good.  He warned her that with Xanax, Soma, Klonopin, and Ambien she would run the risk of over sedating.

The rest of the appointment was spent discussing personal issues.  They both complained about their money troubles, and Dr. MacKay talked about the DEA's investigation.  Dr. MacKay asked K.D. whether he had her newest phone number and promised her that "if anything goes better for me I'll . . . give you a call."  *Id.*  K.D. complained about how swollen her neck was and said "I need a massage."  Dr. MacKay replied, "Right through there, yeah."  K.D. then asked, "That means no more massages?  No more help – at all?"  Dr. MacKay laughed

-11-

and later told her, "Well, let's see if things get any better for us here." *Id.*

K.D. then asked Dr. MacKay if one of his employees "get[s] mad that I close the door?" *Id.* (alteration in original). He told her, "She does. She thinks your [sic] doing nasty things in here." K.D. replied, "[N]o, I would never do that. . . . Well, not in the office." *Id.* (second alteration in original). After discussing personal issues a bit more, the appointment ended. K.D. left with prescriptions for 90 tablets of OxyContin 40 mg., 120 tablets of oxycodone 30 mg., 30 tablets of Xanax, and 60 tablets of Fioricet.

During the four years K.D. was Dr. MacKay's patient, the number of controlled substances he prescribed for her escalated, along with their dosages. Dr. Hare testified there was nothing in Dr. MacKay's file on K.D. to justify the changes in drugs that he was prescribing for her. Similarly, when Dr. MacKay changed his recorded diagnosis of K.D.'s ailment from cervical spine pain to low back pain, Dr. Hare found no indication that Dr. MacKay conducted any evaluation to warrant the change in diagnosis. Dr. Hare testified Dr. MacKay's notes were "quite superficial on the initial evaluation, [and had] very little in the way of history or physical exam . . . ." *Id.* at 49,972. According to Dr. Hare, K.D.'s medical records were inadequate to justify the prescribing of controlled substances.

Dr. Hare also found in Dr. MacKay's files numerous common indicators that K.D. was abusing drugs. Her file contained reports from the State of Utah

-12-

showing she was receiving controlled substances from multiple physicians and multiple pharmacies at the same time. A 2008 fax from the local narcotics task force stated that K.D. had obtained controlled substances from five prescribers and twelve pharmacies between December 2006 and December 2007. A 2005 police report in her file indicated that she and her husband had an altercation over her ongoing drug abuse problem. She repeatedly sought replacement prescriptions after claiming her medications were stolen. Dr. Hare noted several points in K.D.'s file in which Dr. MacKay seemed to be concerned about K.D's behavior and wrote that he was going to place her on probation and limit her to one prescriber and one pharmacy. But, Dr. Hare explained, whatever limitations Dr. MacKay imposed were brief, and then K.D. would return to her old habits. In Dr. Hare's view, "the records indicate an ongoing problem of drug misuse, abuse," *id.*, meaning that Dr. MacKay should have addressed these issues more appropriately. He concluded that "the evaluation . . . and the record don't support the long-term prescribing of controlled substances [to K.D.]" *Id.*

Dr. MacKay introduced testimony by a different medical expert, Dr. Perry Fine, along with affidavits and testimony by patients and medical professionals from the community in which he practiced, all in support of his continued registration. Dr. MacKay's numerous patients and colleagues relayed their positive experiences with him, his well-regarded reputation in the community, and their impressions that he provided excellent care to his patients. Several of Dr.

-13-

MacKay's patients testified that he had given them beneficial treatment for legitimate pain problems.

Dr. Fine reviewed some of Dr. MacKay's patient files, including the medical records of K.D. and M.R. Based on the files he reviewed, he testified that the medical care given by Dr. MacKay to these patients was justified, and that Dr. MacKay treated these patients in a professional medical environment. He did not specifically discuss K.D. and M.R.'s patient files. Instead, he said his general conclusion that Dr. MacKay's treatment of his patients was medically appropriate also applied to M.R. and K.D. When he was asked to discuss the transcripts of M.R. and K.D.'s recorded appointments, Dr. Fine testified that he was unable to "make sense out of" the transcripts. *Id.* at 49,966. Without access to a "full audiovisual recording" of the appointments, he said he could not draw conclusions about what had transpired during those appointments. *Id.*

Dr. MacKay did not testify.[7]

## II.

On July 31, 2009, the ALJ issued his recommended decision, finding the DEA presented sufficient evidence to establish that Dr. MacKay had "committed

---

[7] Both sides presented other evidence which we do not recount here. For a more thorough description of the evidence presented during the hearing, see *MacKay*, 75 Fed. Reg. at 49,959-72.

acts that are inconsistent with the public interest." *Id.* at 49,958 (citing ALJ

Recommendation at 114). The described acts included exchanging prescription

drugs with K.D. for sexual favors, dispensing prescription drugs to patients

without first conducting appropriate diagnostic evaluations, providing

prescription drugs to K.D. despite being aware she was drug-dependent, and

maintaining inaccurate, incomplete, and misleading patient records – all in

violation of Utah law. The ALJ recommended that the Deputy Administrator

revoke Dr. MacKay's registration and deny any pending application to renew it

because Dr. MacKay "'ha[d] not accepted responsibility for his actions, expressed

remorse for his conduct at any level, or presented evidence that could reasonably

support a finding that the [DEA] should continue to entrust him with a

registration.'" *Id.* (quoting ALJ Recommendation at 114). Dr. MacKay filed

exceptions to the ALJ's recommendation, contending it was based on insufficient

evidence.

The Deputy Administrator adopted the ALJ's recommendation. After

reviewing all of the evidence and Dr. MacKay's objections, she agreed with the

ALJ that Dr. MacKay "has committed acts which render his continued registration

inconsistent with the public interest." *Id.* She endorsed the ALJ's analysis and

found that evidence of Dr. MacKay's conduct with respect to M.R. and K.D.

constituted a prima facie showing that his continued registration would be

inconsistent with the public interest. *See id.* at 49,977. Even assuming Dr.

-15-

MacKay complied with the law in treating all of his other patients, the Deputy Administrator concluded that fact would not refute the evidence of intentional diversion of controlled substances to K.D. and M.R. *Id.* Based on Dr. MacKay's failure to testify, she concluded that he "does not accept responsibility for his misconduct, and therefore, he has not rebutted the Government's prima facie showing that his continued registration is inconsistent with the public interest." *Id.* She held that Dr. MacKay's "egregious misconduct," coupled with his failure to acknowledge wrongdoing or show remorse, warranted revoking his registration and denying any pending requests to renew or modify the registration. *Id.* at 49,978.

Dr. MacKay asks us to reverse the Deputy Administrator's decision and to reinstate his registration. *See* 21 U.S.C. § 877.

**III.**

The Controlled Substances Act requires practitioners who dispense controlled substances to obtain a valid registration. 21 U.S.C. § 822(a)(2). The Deputy Administrator may revoke a practitioner's registration if she determines the practitioner "has committed such acts as would render his registration . . . inconsistent with the public interest." *Id.* § 824(a)(4); *see also* 28 C.F.R. §§ 0.100(b), 0.104. The agency is required to consider five factors "[i]n determining the public interest":

-16-

(1) The recommendation of the appropriate State licensing board or professional disciplinary authority.

(2) The applicant's experience in dispensing, or conducting research with respect to controlled substances.

(3) The applicant's conviction record under Federal or State laws relating to the manufacture, distribution, or dispensing of controlled substances.

(4) Compliance with applicable State, Federal, or local laws relating to controlled substances.

(5) Such other conduct which may threaten public health and safety.

21 U.S.C. § 823(f). Although the Deputy Administrator must consider each of these factors, she "need not make explicit findings as to each one and can 'give each factor the weight [she] determines is appropriate.'" *Volkman v. DEA*, 567 F.3d 215, 222 (6th Cir. 2009) (quoting *Hoxie v. DEA*, 419 F.3d 477, 482 (6th Cir. 2005)); *see also Morall v. DEA*, 412 F.3d 165, 173-74 (D.C. Cir. 2005) (similar).

"Registrants dispensing controlled substances must comply with a number of statutory and regulatory requirements." *Morall*, 412 F.3d at 174. As relevant here, DEA regulations provide that a prescription is lawful only if "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). "The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner . . . ." *Id.* Similarly, with the exception of circumstances irrelevant to this case, in Utah it constitutes "unprofessional conduct" for a physician to

-17-

issue a prescription for a drug "without first obtaining information in the usual course of professional practice, that is sufficient to establish a diagnosis, to identify conditions, and to identify contraindications to the proposed treatment." Utah Code Ann. § 58-1-501(2)(m)(i). Not surprisingly, it is "unprofessional conduct" for a licensed physician to "sexually abus[e] or exploit[] any person through conduct connected with the licensee's practice." *Id.* § 58-1-501(2)(k). Under Utah administrative rules, unprofessional conduct also includes:

> (4) failing to maintain controls over controlled substances which would be considered by a prudent practitioner to be effective against diversion, theft, or shortage of controlled substances;
> . . .
> (6) knowingly prescribing, selling, giving away, or administering, directly or indirectly, or offering to prescribe, sell, furnish, give away, or administer any controlled substance to a drug dependent person, as defined in Subsection 58-37-2(s), except for legitimate medical purposes as permitted by law . . . .

Utah Admin. Code r. 156-37-502.

The DEA has the ultimate burden of proving that revocation is warranted. 21 C.F.R. § 1301.44(e). Cognizant of this, the Deputy Administrator has consistently held that once the government establishes a prima facie case showing a practitioner has committed acts which render his registration inconsistent with the public interest, the burden shifts to the practitioner to show why his continued registration would be consistent with the public interest. *See, e.g.*, *Medicine Shoppe-Jonesborough*, 73 Fed. Reg. 364, 387 (DEA Jan. 2, 2008) (citing cases).

If the Deputy Administrator's findings of fact are supported by substantial

-18-

evidence, they are conclusive. *See* 21 U.S.C. § 877. We have recognized that substantial evidence is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). It "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted); *see also Rapp v. Office of Thrift Supervision*, 52 F.3d 1510, 1516 (10th Cir. 1995).

Under the Administrative Procedure Act, we may set aside the Deputy Administrator's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] unsupported by substantial evidence . . . ." 5 U.S.C. § 706(2). An agency decision is arbitrary and capricious if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

"The scope of our review under the 'arbitrary or capricious' standard is narrow and we are not to substitute our judgment for that of the agency." *Colo. Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006) (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). To uphold the Deputy Administrator's decision under this standard, we must satisfy ourselves that she

-19-

"examined the relevant data and articulated a satisfactory explanation for [her] decision, including a rational connection between the facts and the decision made." *See id.* (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). If we are so convinced, her decision must stand.

## A.

Dr. MacKay contends the Deputy Administrator's decision is arbitrary and capricious and not supported by substantial evidence. He argues the Deputy Administrator failed properly to consider and weigh the five statutory public-interest factors as required by 21 U.S.C § 823(f) and ignored evidence in his favor. For these reasons, he submits, we must reverse the Deputy Administrator's revocation decision.

In her discussion of the five statutory public interest factors, the Deputy Administrator first examined factors one and three. She acknowledged that Dr. MacKay held a valid medical license in Utah and that there was "no 'recommendation' one way or the other from the State Board as to whether [Dr. MacKay] should retain his registration (factor one)." *MacKay*, 75 Fed. Reg. at 49,973. She also observed that Dr. MacKay "had not been convicted of an offense related to controlled substances . . . (factor three)."[8] *Id.* Nevertheless, as

_____

[8] After oral argument in this appeal, Dr. MacKay was found guilty of committing forty violations of the Controlled Substances Act. These convictions included illegally dispensing and distributing controlled substances to K.D. and M.R. on the days of their recorded appointments. *See* Indictment at 10-11, *United*

(continued...)

she explained, "[A] State's failure to take action against a registrant's medical license is not dispositive in determining whether the continuation of a registration is in the public interest," because the DEA has separate oversight responsibility with respect to controlled substances. *Id.* (internal quotation marks omitted). Similarly, she noted that "while a history of criminal convictions for offenses involving the distribution or dispensing of controlled substances is a highly relevant consideration, . . . the absence of such a conviction is of considerably less consequence in the public interest inquiry." *Id.*

Regarding factors two and four, the Deputy Administrator found clear and convincing evidence that Dr. MacKay knowingly diverted controlled substances in violation of state and federal law through various acts including: giving inadequate examinations to support prescriptions for controlled substances, prescribing drugs to M.R. despite knowing she was not a legitimate pain patient, prescribing drugs to K.D. despite obvious indications that she was overusing and abusing drugs, and providing prescriptions for controlled substances to K.D. in exchange for sexual favors. *Id.* at 49,973-77. The Deputy Administrator found it unnecessary to make findings under factor five in light of her findings under

---

[8](...continued)
*States v. MacKay*, 1:10-cr-00094 (D. Utah Aug. 5, 2010) (counts 4-7 and 11-14); Jury Verdict at 2, *MacKay*, 1:10-cr-00094 (D. Utah Sept. 26, 2011). He was also found guilty of illegally dispensing and distributing a controlled substance to K.D. on September 23, 2006 – the day the Deputy Administrator found Dr. MacKay met K.D. in the motel room. *See* Indictment at 10-11, *MacKay*, 1:10-cr-00094 (count 8); Jury Verdict at 2, *MacKay*, 1:10-cr-00094.

factors two and four.  *See id.* at 49,977 n.38.

Our review of the record persuades us that substantial evidence supports the Deputy Administrator's findings under factors two and four.  As we have detailed above, testimony and patient records reflect that Dr. MacKay failed to determine a medical need for prescribing controlled substances to K.D. and M.R., either initially or over the course of seeing these patients.  K.D. and M.R. both testified that their appointments with Dr. MacKay rarely involved either a physical examination or a discussion of their pain.  The recorded undercover appointments confirm that Dr. MacKay discussed little – if anything – about M.R. or K.D.'s medical conditions before issuing prescriptions for controlled substances to them.  Dr. MacKay even continued to prescribe controlled substances to M.R. after she told him she had shared her drugs with a friend.  The DEA's expert, Dr. Hare, testified that the medical records were totally inadequate to support the prescriptions Dr. MacKay wrote for these patients.

Similarly, substantial evidence supports the Deputy Administrator's determination that Dr. MacKay prescribed escalating amounts of controlled substances to K.D. despite obvious indicators that she was misusing or abusing the medication.  According to documents in the medical file, she repeatedly claimed she lost her drugs or that someone had stolen them.  She requested refills early.  She received prescriptions from multiple doctors and pharmacies at the same time, a fact known to Dr. MacKay.  Substantial evidence also supports the

Deputy Administrator's determination that on multiple occasions while K.D. was Dr. MacKay's patient, Dr. MacKay engaged in sexual activities with her in exchange for giving her prescriptions for controlled substances.

Despite Dr. MacKay's claim to the contrary, the Deputy Administrator considered the entire record, including the evidence in Dr. MacKay's favor. She determined, however, that none of Dr. MacKay's evidence negated the DEA's prima facie showing that Dr. MacKay had intentionally diverted drugs to K.D. and M.R. *Id.* at 49,977. Indeed, she found that even if Dr. MacKay had provided proper medical care to all of his other patients, that fact would not overcome the government's evidence with regard to M.R. and K.D.

None of the evidence presented by Dr. MacKay undermines the evidence relating to M.R. and K.D. Although numerous patients and colleagues of Dr. MacKay related their positive experiences with him, none had any personal knowledge regarding his treatment of M.R. and K.D. Notably, Dr. MacKay's medical expert, Dr. Fine, failed to specifically discuss and justify Dr. MacKay's treatment of M.R. and K.D. As a result, none of Dr. MacKay's evidence contradicts the testimony and evidence presented by the DEA relating to the knowing diversion of drugs to these two patients.

Nor did the Deputy Administrator misweigh the five statutory factors for determining the propriety of revocation, *see* 21 U.S.C. § 823(f). In light of Dr. MacKay's misconduct relating to factors two and four, the government made a

prima facie showing that Dr. MacKay's continued registration is inconsistent with the public interest. *See MacKay*, 75 Fed. Reg. at 49,977. Although Dr. MacKay may have engaged in the legitimate practice of pain medicine for many of his patients, the conduct found by the Deputy Administrator with respect to K.D. and M.R. is sufficient to support her determination that his continued registration is inconsistent with the public interest.[9]

**B.**

Dr. MacKay contends the Deputy Administrator violated the statutory mandate by considering an additional factor not prescribed by statute: failure to admit fault. Dr. MacKay argues that the Deputy Administrator should not have

---

[9] Dr. MacKay raises several challenges to the ALJ and Deputy Administrator's credibility determinations. The Deputy Administrator deferred to the ALJ's findings that M.R. and K.D. were credible with regard to testimony of their interactions with Dr. MacKay and his treatment of them. *See MacKay*, 75 Fed. Reg. at 49,964, 49,968 n.29. She also deferred to the ALJ's judgment that "Dr. Fine 'intentionally avoid[ed] direct answers that did not favor the Respondent's position'" and that his testimony "was 'evasive' and 'bias[ed] in favor of assuming the correctness of the actions of any doctor.'" *Id.* at 49,963 (quoting ALJ Recommendation at 88, 90) (alterations in original). We are not persuaded that these credibility findings were erroneous. "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990). Substantial evidence supports the findings that K.D. and M.R. were credible. The recorded appointments substantiated their testimony. The DEA also offered Dr. MacKay's motel receipt to corroborate K.D.'s claims that she engaged in sexual contact with Dr. MacKay in a motel room. Finally, a review of Dr. Fine's testimony supports the Deputy Administrator's determination that his testimony was evasive and should be given less weight than the testimony of Dr. Hare.

reached an adverse conclusion from his decision not to testify.

Dr. MacKay's argument lacks merit. The DEA may properly consider whether a physician admits fault in determining if the physician's registration should be revoked. *Hoxie*, 419 F.3d at 483. When faced with evidence that a doctor has a history of distributing controlled substances unlawfully, it is reasonable for the Deputy Administrator to consider whether that doctor will change his or her behavior in the future. And that consideration is vital to whether continued registration is in the public interest. Without Dr. MacKay's testimony, the Deputy Administrator had no evidence that Dr. MacKay recognized the extent of his misconduct and was prepared to remedy his prescribing practices.

Nor was it improper for the Deputy Administrator to draw an adverse inference from Dr. MacKay's failure to testify. "[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them . . . ." *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). This rule applies with equal force to administrative proceedings. *See, e.g.*, *Hoxie*, 419 F.3d at 483 (holding DEA could draw adverse inference from physician's failure to testify during proceedings involving revocation of his controlled substances registration); *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 326 (9th Cir. 1995) ("Not only is it permissible to conduct a civil [administrative] proceeding at the same time as a

-25-

related criminal proceeding, even if that necessitates invocation of the Fifth Amendment privilege, but it is even permissible for the trier of fact to draw adverse inferences from the invocation of the Fifth Amendment in a civil [administrative] proceeding.").

Despite his claims to the contrary, Dr. MacKay did not lose "his livelihood because he did not testify." Reply Br. at 12. Instead, he lost his livelihood because the DEA presented sufficient evidence that he distributed controlled substances illegally and he failed to offer evidence that he would alter his conduct in the future. Substantial evidence supports the Deputy Administrator's conclusion that Dr. MacKay's continued registration is inconsistent with the public interest.

## C.

Dr. MacKay alternatively argues that it would have been more appropriate under DEA precedent to restrict his DEA registration rather than revoke it entirely. We disagree.

Under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), the Deputy Administrator's choice of sanction "is entitled to substantial deference," *Chein v. DEA*, 533 F.3d 828, 835 (D.C. Cir. 2008), and we will set it aside only if her decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Ordinarily, the mere unevenness in the application of a sanction will

-26-

> not render its application in a particular case "unwarranted in law."
> If the revocation represents a flagrant departure from DEA policy
> and practice, however, and if the departure is not only unexplained,
> but entirely unrecognized in the [Deputy Administrator's] decision,
> the agency's sanction cannot withstand abuse of discretion review.

*Chein*, 533 F.3d at 835 (quoting *Morall*, 412 F.3d at 183) (internal quotation marks, citations, and alterations omitted).

Here, the sanction of revocation is neither a flagrant departure from DEA policy and practice nor unexplained in the Deputy Administrator's decision. The Deputy Administrator has previously explained that "this Agency has long held . . . that findings under a single factor [of 21 U.S.C. § 824(a)] are sufficient to support the revocation of a registration." *Jayam Krishna-Iyer, M.D.*, 74 Fed. Reg. 459, 462 (DEA Jan. 6, 2006). In this same decision, the Deputy Administrator noted that if "some isolated decisions of this Agency may suggest that a practitioner who committed only a few acts of diversion was entitled to regain his registration even without having to accept responsibility for his misconduct, the great weight of the Agency's decisions are to the contrary." *Id.* at 464 (citation omitted). Because the diversion of controlled substances poses a "grave and increasing harm to public health and safety," the Deputy Administrator made clear that even where only a few acts of diversion have been committed, "this Agency will not grant or continue the practitioner's registration unless he accepts responsibility for his misconduct." *Id.* Accordingly, the Deputy Administrator overruled prior DEA decisions suggesting that a practitioner may regain his

-27-

registration without accepting responsibility for his conduct. *Id.* at 464 n.9. Because Dr. MacKay has not accepted responsibility for his conduct, revocation of his registration is entirely consistent with DEA policy.

Dr. MacKay relies on several DEA decisions in which physicians were given restricted registrations in arguing that the revocation of his registration is inconsistent with DEA precedent. We agree with the Deputy Administrator that each of these decisions is distinguishable, *see MacKay*, 75 Fed. Reg. at 49,977-78, and none of them suggests the revocation of Dr. MacKay's registration was an abuse of discretion.

*Paul J. Caragine, Jr.*, 63 Fed. Reg. 51,592 (DEA Sept. 28, 1998), provides the best support for Dr. MacKay's argument, but does not undermine the Deputy Administrator's choice of sanction. The physician in *Caragine* engaged in many actions similar to Dr. MacKay, including prescribing drugs in high quantities to patients exhibiting drug-seeking behavior and maintaining incomplete or inaccurate medical records. *See id.* at 51,594-98. Unlike Dr. MacKay, however, the physician in *Caragine* acknowledged that he should have recognized some of his patients were addicted, admitted he should have treated some of his patients differently, and voluntarily underwent training to help him better identify and treat drug-seeking patients. *Id.* at 51,594-98, 51,601. More importantly, the Deputy Administrator explained in proceedings below that in light of *Krishna-Iyer*, 74 Fed. Reg. at 464 & n.9, if a case like *Caragine* were to arise today she

-28-

"would likely deny the petitioner's application." *MacKay*, 75 Fed. Reg. at 49,978 n.39. Thus, the precedential value of *Caragine* is questionable in light of the DEA's worry that in recent years the "diversion of controlled substances has become an increasingly grave threat to this nation's public health and safety." *Krishna-Iyer*, 74 Fed. Reg. at 463.

The physician in *William P. Jerome, M.D.*, 61 Fed. Reg. 11,867, 11,867-68 (DEA Mar. 22, 1996), exchanged controlled substances for sexual favors, money, and cocaine. Dr. Jerome voluntarily surrendered his registration when he pled guilty to conspiracy to distribute controlled substances. *Id.* at 11,868. Six years later, after serving his prison term and undergoing rehabilitation, he was granted a restricted registration to dispense controlled substances. *Id.* at 11,869-70. Unlike Dr. MacKay, however, Dr. Jerome admitted he had violated federal law and "testified as to his remorse for his past misconduct and his determination that he [would] not engage in such conduct in the future." *Id.* at 11,870.

*Larry L. Kompus, M.D.*, 55 Fed. Reg. 30,990 (DEA July 30, 1990), is similarly distinguishable. In that proceeding, the physician had been convicted of crimes relating to exchanging controlled substances for sexual favors. But the misconduct occurred more than ten years before the physician was granted a restricted registration and the evidence showed no misconduct by the physician after his release from prison. *Id.* at 30,992. Moreover, the physician "acknowledged the wrongfulness of his actions and [had] shown remorse for

them." *Id.*

In *Karen A. Kruger, M.D.*, 69 Fed. Reg. 7016, 7018 (DEA Feb. 12, 2004), the physician was diverting drugs to herself, admitted fault, and had undergone treatment for her drug dependency. Furthermore, nearly five years had passed without any evidence of misuse of controlled substances. *Id.*

Finally, in *Wesley G. Harline, M.D.*, 65 Fed. Reg. 5665 (DEA Feb. 4, 2000), the physician admitted to having violated state law, *id.* at 5669, showed remorse, *id.* at 5671, and testified that he was now complying with all state, federal, and local laws, *id.* at 5669.

Unlike the physicians in those cases, Dr. MacKay has never admitted any fault or taken responsibility for his misconduct. Nor can he point to any evidence that he reformed his habits. Instead, he continued to illegitimately dispense controlled substances even when he knew the DEA was investigating him. The Deputy Administrator's revocation of Dr. MacKay's registration is consistent with the DEA's policy and practice of revoking registration under such circumstances.

## IV.

For these reasons, we **DENY** Dr. MacKay's petition for review.