# FIRST DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

_____

No. 1D17-1571
_____

OSAKATUKEI O. OMULEPU, M.D.,

　　Appellant,

　　v.

DEPARTMENT OF HEALTH, BOARD
OF MEDICINE,

　　Appellee.

_____

On appeal from the Department of Health, Board of Medicine.
Magdalena Averhoff, Chair.

June 22, 2018

OSTERHAUS, J.

Dr. Osakatukei Omulepu appeals a final order of the Board of Medicine revoking his license to practice medicine. Dr. Omulepu argues that the decision violated his Fifth Amendment rights by incorporating an adverse inference against him based on his decision to remain silent at his formal hearing in response to evidence of medical malpractice. He argues additionally that the administrative complaint failed to properly charge him and that the evidence did not support the charges filed by the Department of Health. We disagree with these arguments and affirm.

I.

In 2016, the Department filed an administrative complaint against Dr. Omulepu seeking disciplinary action against his medical license. The Department alleged in a nine-count complaint that Dr. Omulepu violated § 458.331(1), Florida Statutes (2014). According to the allegations, during a three-day period in May 2015, four of Dr. Omulepu's liposuction patients experienced severe post-surgery complications requiring hospitalization. The Department asserted that in all four cases, Dr. Omulepu deviated from the standard of care by using an improper concentration of epinephrine in a surgical solution that is used to reduce bleeding and failing to maintain accurate medical records of the concentration of epinephrine. *See* § 458.331(1)(m) & (t), Fla. Stat. It also alleged medical malpractice against Dr. Omulepu for puncturing the internal organs of two of the patients. *See* § 458.331(1)(t), Fla. Stat.

The complaint led to a formal hearing before an administrative law judge in October 2016. After the hearing, the ALJ issued recommended findings of fact and conclusions of law that Dr. Omulepu committed medical malpractice and violated the medical records law. Specifically, the ALJ found that Dr. Omulepu committed medical malpractice by puncturing the internal organs of two patients by an "improper angling of the cannula during the procedures." In reaching this conclusion, the ALJ relied partly upon an adverse evidentiary inference against Dr. Omulepu because he declined to testify or explain how the organ punctures occurred. In addition, the ALJ found in Dr. Omulepu's favor as to the charges of using an improper concentration of epinephrine to control bleeding in four patients, but found that he failed to create and keep medical records accurately reflecting the concentration of epinephrine given to them. The ALJ recommended that Dr. Omulepu be disciplined with a fine, probation, and costs.

The Board of Medicine then took up the recommended order, approving and incorporating almost all of it into its Final Order. The Board rejected, however, the discipline recommended by the ALJ. Due to the severity of the injuries to Dr. Omulepu's patients within the span of a single day, it decided to revoke his license to practice medicine. Dr. Omulepu timely appealed.

2

II.

A.

Dr. Omulepu contends first on appeal that the Board erred by accepting the ALJ's adverse inference because he remained silent about the medical malpractice charges at his formal hearing. He asserts that this adverse inference violated his right not to incriminate himself under the Fifth Amendment to the United States Constitution. We disagree.

The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This privilege may be asserted in proceedings to protect "against any disclosures which the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States*, 406 U.S. 441, 445 (1972). In the criminal context, the defendant's silence may not be considered as evidence of guilt. *Marston v. State*, 136 So. 3d 563, 569 (Fla. 2014) (quoting *Griffin v. California*, 380 U.S. 609, 615 (1965)).

The Florida Supreme Court has recognized the Fifth Amendment right against self-incrimination to apply in the context of professional license revocation cases because they are "penal" in nature. *State ex rel. Vining v. Fla. Real Estate Comm'n.*, 281 So. 2d 487, 491 (Fla. 1973). Agreeing that *Vining* applies here, the Department asserts that the scope of the Fifth Amendment's protection is nevertheless circumscribed in civil cases like this one. It argues that, unlike the criminal context, the Fifth Amendment protection in civil cases allows fact-finders to consider a defendant's silence as evidence of guilt. The Department's argument is backed by the opinion of the United States Supreme Court in *Baxter v. Palmigiano* that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them." 425 U.S. 308, 318 (1976). Various federal courts have noted that *Baxter* applies "forcefully in medical discipline cases." *Arthurs v. Stern*, 560 F.2d 477, 478 (1st Cir. 1977) (agreeing with *Baxter* in a medical disciplinary proceeding that "the trier of fact [may] treat

3

silence as evidence of guilt"); *see also MacKay v. Drug Enf't Admin.*, 664 F.3d 808, 820 (10th Cir. 2011) (citing *Baxter* and affirming the revocation of a medical doctor's registration to dispense controlled substances). Florida cases also echo the rule from *Baxter*. *See, e.g., Vasquez v. State,* 777 So. 2d 1200, 1203 (Fla. 3d DCA 2001); *Atlas v. Atlas*, 708 So. 2d 296, 299 (Fla. 4th DCA 1998). The Florida Supreme Court in *Boedy v. Department of Professional Regulation,* 463 So. 2d 215, 218 (Fla. 1985) for example, found it constitutionally permissible to deny authority to practice medicine "to a physician who asserts the privilege against self-incrimination if his claim has prevented full assessment of his fitness and competency to practice." The *Boedy* opinion noted that

> [w]hen a conflict arises between the right of a physician to pursue the medical profession and the right of the sovereignty to protect its citizenry, it follows that the rights of the physician must yield to the power of the state to prescribe reasonable rules and regulations which will protect the people from incompetent and unfit practitioners.

*Id.* at 217; *cf., Borrego v. Agency for Health Care Admin.*, 675 So. 2d 666, 668 (Fla. 1st DCA 1996) (affirming the revocation of a medical license against a Fifth Amendment double jeopardy claim because the sanction was "remedial rather than punitive," and noting that a medical license "is . . . a privilege granted by the sovereign, which may be withdrawn to 'preserve the public health, morals, comfort, safety and the good order of society'") (quoting *State ex rel. Munch v. Davis*, 196 So. 491, 493-94 (Fla. 1940)).

In this case, the Department presented competent, substantial evidence that Dr. Omulepu committed malpractice by puncturing the organs of two patients during their cosmetic surgery procedures. In the face of this evidence, Dr. Omulepu exercised his Fifth Amendment right to remain silent. He wasn't forced to waive this right. In view of his silence, the ALJ applied an adverse inference, citing *Baxter*. The ALJ and Final Order did not, however, as a "consequence of [Dr. Omulepu's] silence automatically [find him] guilty of the infraction with which he has been charged." *Baxter*, 425 U.S. at 317. Rather, the adverse inference combined with other probative evidence that advanced

the Department's case—expert testimony identifying the improper angling of the cannula, multiple punctures of patient organs, and Dr. Omulepu's admission to a patient's mother that he'd "messed up" with a new cannula—supported the Board's ultimate decision. Under these circumstances, the adverse inference drawn by the ALJ, and accepted by the Board's Final Order, did not violate Dr. Omulepu's Fifth Amendment rights.

## B.

We likewise affirm with respect to Dr. Omulepu's other claims involving the sufficiency of the evidence and alleged disparities between the administrative complaint and evidence deduced at the hearing. We recognize that a physician may not be "disciplined for an offense not charged in the complaint." *Trevisani v. Dep't of Health*, 908 So. 2d 1108, 1109 (Fla. 1st DCA 2005); *Ghani v. Dep't of Health*, 714 So. 2d 1113 (Fla. 1st DCA 1998). An administrative complaint must "afford 'reasonable notice to the licensee of facts or conduct which warrant' disciplinary action." *Cottrill v. Dep't of Ins.*, 685 So. 2d 1371, 1372 (Fla. 1st DCA 1996) (quoting § 120.60(5), Fla. Stat.). Here, contrary to Dr. Omulepu's assertions, the administrative complaint did not fail to notice the charges against him. The violations found by the Board—medical malpractice in puncturing the internal organs of patients (*see* counts I and II of the Second Amended Complaint), and failing to create or maintain accurate records regarding the concentration of epinephrine used (*see* counts VI through IX)—were consistent with the allegations, which also were proven with competent, substantial evidence.

## III.

For these reasons, we affirm the Board of Medicine's final order.

LEWIS, J., concurs; MAKAR, J., concurs with opinion.

5

*Not final until disposition of any timely and authorized motion under Fla. R. App. P. 9.330 or 9.331.*

MAKAR, J., concurring.

Today's decision holds for the first time that a physician's exercise of his constitutional right against self-incrimination permits an adverse inference to be drawn against him in an administrative disciplinary action based on his failure to use reasonable care in treating patients. Guidance is long overdue on this topic. The practice has been to permit administrative law judges to draw adverse inferences from a physician's silence, but when and how that is done is filled with nuance, qualifications, and unanswered questions. *See generally* Matthew C. Lucas, *Balance of Silence: Weighing the Right to Remain Silent Against the Right of Access to Florida Civil Courts*, 22 U. FLA. J.L. & PUB. POL'Y 1 (2011) (overview of three important issues that arise when the Fifth Amendment privilege is invoked in civil proceedings: "(i) whether to stay the civil lawsuit prior to the completion of parallel criminal proceedings; (ii) how to weigh discovery disputes and access to information against a party's Fifth Amendment privilege; and (iii) what substantive effect, if any, a litigant's refusal to testify has on the outcome of the civil proceedings").

The "constitutional struggle" between a litigant's right to remain silent and society's interest in adjudicating a civil dispute, as Judge Lucas framed it in his article, *id.* at 23-24, arises "in even more pronounced ways" as a civil case progresses. Two of the leading supreme court cases underlying today's decision reflect that struggle: *Boedy v. Department of Professional Regulation*, 463 So. 2d 215 (Fla. 1985) and *State ex rel. Vining v. Florida Real Estate Commission*, 281 So. 2d 487 (Fla. 1973). Neither arose in the context of medical negligence, but both provide helpful parameters for future physician disciplinary cases.

6

*Boedy* involved a physician, but his Fifth Amendment claim was a right to refuse to submit to *any* mental and physical examinations. At issue was his fitness to practice generally, rather than his exercise of care as to patients. In this context, our supreme court held that "it is constitutionally permissible to deny authority to practice medicine to a physician who asserts the privilege against self-incrimination if his claim has prevented full assessment of his fitness and competency to practice." *Boedy*, 463 So. 2d at 218. The court reasoned that although the "Fifth Amendment privilege against self-incrimination protects the accused from being compelled to testify against himself[,] [it] does not extend to the exclusion of evidence of his physical or mental condition when such evidence is otherwise admissible, even when the evidence is obtained by compulsion." *Id.* at 217. The reasons why the privilege didn't apply were two-fold: the physician's competence was at issue, not his guilt or innocence, and a statute explicitly protected the physician's interest against compelled testimony providing that "neither the testimony received from a physician, nor the orders subsequently entered on the basis of that testimony may be used against the physician in any other administrative, civil or criminal proceeding." *Id.* at 218.

Unlike Dr. Boedy, Dr. Omulepu was not required to give up his testimonial privilege in this disciplinary proceeding. Instead, he exercised that right, the question presented being the evidentiary value of his silence as to his provision of medical care. On this point, *Boedy* signaled that a tradeoff exists in physician discipline cases between the exercise of the privilege and the retention of the "benefits of the status of being a licensed physician." *Id.* In *Boedy*, the balance was struck to compel the mental and physical examinations of the physician but protect against their use in any legal proceedings thereafter. The balance here, in contrast, is not to compel testimony but to allow an adverse inference from the decision to remain silent, which raises potential constitutional implications such as those discussed in *Vining*, next discussed.

In *Vining*, the supreme court held that a statute, which compelled a realtor to file a sworn answer to allegations against him or lose his license by default, amounted to a coercive deprivation of the Fifth Amendment right to withhold testimony

7

in an administrative proceeding. 281 So. 2d at 491-92 ("The basic constitutional infirmity of the statute lies in requirement of a response under threat of license revocation or suspension, which amounts to compelling the defendant to be a witness against himself" under the state and federal constitutions.). In doing so, the court made clear that the Fifth Amendment "right to remain silent applies not only to the traditional criminal case, but also to proceedings 'penal' in nature in that they tend to degrade the individual's professional standing, professional reputation or livelihood." *Id.* at 491. Further, it surmised that "a legislative enactment allowing but not requiring a defendant to answer would not be constitutionally objectionable, but we are not confronted with such a provision here." *Id.* at 492.

An obvious takeaway from *Vining* is that license-deprivation is penal in nature, thereby confirming that other professionals, such as attorneys and physicians, retain their Fifth Amendment privilege in the face of administrative disciplinary proceedings. Less obvious is the court's holding that the statute at issue effectively shifted the burden of proof from the Real Estate Commission to the realtor, an unconstitutional result under the court's analysis. *Id.* By parallel reasoning, other forms of proof or procedure that shift the evidentiary burden—such as a presumption of negligence—could be subject to invalidation.

Applied here, the question is whether allowing an adverse inference from Dr. Omulepu's silence can be drawn without crossing the line into invalid burden-shifting. On this point, an adverse inference is unlike a presumption because it merely allows the fact-finder to infer a fact that is rationally related to facts established in the record; it does not require that an inference be adverse, nor does it shift the burden of proof. But the concept has the potential to be misconstrued as allowing an adverse inference to become an independent fact that by itself can meet the burden of proof to establish substandard patient care, which it cannot. For example, in *Scott v. Department of Professional Regulation*, 603 So. 2d 519 (Fla. 1st DCA 1992), *opinion clarified* (Aug. 12, 1992), a license-suspension order was reversed because it was based entirely on an inadmissible hearsay report. The nurse failed to appear at the hearing or respond to the complaint against her, but doing so "did not relieve the [Department] of its obligation to

substantiate the charges by presenting sufficient evidence." *Id.* at 520. Had Nurse Scott chosen to appear, but invoked her privilege and refused to testify, a similar result would have been likely: sufficient record evidence—apart from any adverse inference—would have been necessary to support license-suspension. *See, e.g.*, *Golden Yachts, Inc. v. Hall*, 920 So. 2d 777, 780 (Fla. 4th DCA 2006) ("The adverse inference instruction does not relieve a party from its burden of proof at trial.").

As to Dr. Omulepu's silence, the administrative law judge not only drew from it an adverse inference that malpractice occurred, but also concluded that it was the "only inference" to be drawn in the case based on other evidence independently establishing that Dr. Omulepu had acted negligently; indeed, Dr. Omulepu had tacitly admitted to doing so by telling a patient's mom that he'd "messed up" the surgery. Sufficient record evidence—apart from the adverse inference from the physician's silence—supported the factual findings of substandard medical care, making the adverse inference supplemental (and probably unnecessary) to affirm in this case (or making it harmless error if the adverse inference had been impermissibly drawn).

The point is that an inference must be rooted in and flow directly from record evidence establishing professional misconduct; an inference alone cannot establish liability. *See, e.g.*, *Eagle Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1304 (11th Cir. 2009) ("[A] dismissal following the assertion of the Fifth Amendment violates the Constitution where the inferences drawn from Fifth–Amendment–protected silence are treated as a substitute for the need for evidence on an ultimate issue of fact."). As Judge Lucas said on this point:

> The effect of the adverse inference is not without limits. For example, under federal law, a court may not enter summary judgment or dismiss a complaint based solely on a party's assertion of the Fifth Amendment and the adverse inference against the litigant's silence. This follows from the basic proposition that whatever inference or persuasiveness it may give rise to, silence, by itself, is not a substitute for evidence. Nor has any reported Florida decision upheld adjudication in favor of

a plaintiff's claim absent some evidence in addition to the defendant's Fifth Amendment objection.

*Balance of Silence*, at 36 (footnotes omitted). Simply put, an administrative complaint of medical negligence against a physician who chooses to exercise a Fifth Amendment privilege cannot support discipline without adequate supporting evidence of the claimed misconduct; the physician's silence is insufficient to shift or meet the regulator's evidentiary burden.

A final note is that Fifth Amendment jurisprudence as it applies to criminal trials versus civil proceedings is starkly different. Silence is protected vigilantly in the former (to prevent government overreach in criminal cases) but loathed in the latter (because society expects people to defend themselves against false charges). This gulf signifies an ongoing need to discern where to draw the "line between unlawful compulsion against one party's right to remain silent and infringement of another party's right of access to the court" as Judge Lucas has written. *Id.* at 43. "Drawing it inescapably involves a question of judgment." *Id.*

———————————————————

Monica L. Felder Rodriguez, Rodriguez & Perry, P.A., Coral Springs, for Appellant.

Sarah Young Hodges, Chief Appellate Counsel; Carrie B. McNamara, Katelyn R. Boswell, and Mari H. McCully, Assistant General Counsels, Florida Department of Health, Tallahassee, for Appellee.