NOT RECOMMENDED FOR PUBLICATION
File Name: 19a0159n.06

No. 18-3327

**UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

**FILED**

Apr 01, 2019

DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| TRISHA DORAN, M.D., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ROBERT WILKIE, Secretary for the United States | ) | COURT FOR THE SOUTHERN |
| Department of Veterans Affairs, et al., | ) | DISTRICT OF OHIO |
| | ) | |
| Defendants-Appellees. | ) | |

**BEFORE: KETHLEDGE, WHITE, and BUSH, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Plaintiff-Appellant Dr. Trisha Doran's employment at a Veterans Affairs (VA) care center was terminated after internal administrative reviews concluded that her treatment of several patients failed to meet the standard of care, she acted with a lack of candor, she inappropriately documented a patient's record, and she performed a procedure without appropriate privileges. A VA Disciplinary Appeals Board sustained the charges in part and affirmed her termination. Dr. Doran then challenged the Board's decision in federal district court. The district court granted summary judgment to the Secretary of the U.S. Department of Veterans Affairs and the U.S. Department of Veterans Affairs. Dr. Doran appeals and we affirm.

## I. BACKGROUND

### A. Factual History

Dr. Trisha Doran is a board-certified gastroenterologist and licensed physician in the State of Ohio. She received her undergraduate and medical degrees at The Ohio State University, where

she also completed her post-graduate residency and gastroenterology fellowship. Beginning in 2008, she worked as a gastroenterologist at the Chalmers P. Wylie VA Ambulatory Care Center in Columbus, Ohio. For several years, she earned high praise from her supervisors and her patients. Her annual proficiency reports from 2008 to 2013 rated her competencies as "Outstanding," the highest possible score, and her direct supervisor, Dr. Glen Borchers, consistently remarked on the quality of the care she provided. "Dr. Doran has made an important contribution to care of the GI patient"; "Dr. Doran is a well trained and clinically competent gastroenterologist"; Dr. Doran has "excellent relationships with peers[,] patients and staff," as well as "an extremely low complication rate"; "Dr. Doran has been very dependable"; "She always has suggestions for improved patient care and efficiency." (A.R. 87–94.)

In the 2013-2014 year, however, Dr. Doran's performance report reflected a change. She earned a grade of "Satisfactory" in two competencies, "Low Satisfactory" in two others, and an overall score of "Low Satisfactory." (A.R. 106–07.) The comments by Dr. Borchers suggest that Dr. Doran was struggling to maintain a successful practice under the pressures of a heavy workload: "her practice style is inefficient which often times leads to delays in task completion"; "Dr. Doran is no longer able to attend lectures due to her clinical inefficiencies"; "Dr. Doran failed to submit mandatory administrative peer reviews"; "Dr. Doran is frustrated with the amount of work she is required to complete," and as a result she "has requested additional administrative time and a tour change"; "She seems to lack the ability to cope with normal stressors associated with the roles and responsibilities of a physician." (*Id.*)

On February 23, 2015, Dr. Borchers wrote a letter to Dr. Marc Cooperman, the Chief of Staff of the Columbus VA, expressing "patient safety concerns related to the care provided" by Dr. Doran. (A.R. 744–45.) Dr. Borchers specifically cited four patients whom Dr. Doran had

treated in the past year that he believed warranted internal administrative review—Patient A, Patient B, Patient C, and Patient D. A professional standards board (PSB) was appointed to review the patient safety concerns. The PSB, composed of senior members of the Columbus VA medical staff, convened on March 2, 2015 and reviewed the patient records. The PSB sent a letter to Dr. Cooperman on March 9, 2015, recommending that Dr. Doran "[u]ndergo an extensive 'Fitness for Duty' evaluation (including psychiatric and substance abuse)" and "[r]eceive mentoring/proctoring/education" in several areas. (A.R. 634–36.) A medical executive board (MEB) then convened to review the PSB findings.[1] The MEB, chaired by Dr. Cooperman, questioned Dr. Doran regarding the relevant episodes, reviewed the documentation of Dr. Doran's care, and concluded that the permanent revocation of her privileges at the VA center was warranted. An Administrative Investigation Board (AIB) also performed a review of Dr. Doran's treatment and concurred in the recommended termination.

On June 2, 2015, Dr. Cooperman issued Dr. Doran a Notice of Proposed Removal and Revocation of Clinical Privileges (Notice). The Notice provided the findings in support of the proposed removal.

*Patient A.* On January 26, 2015, Patient A presented for an esophagogastroduodenoscopy (EGD) and a colonoscopy. The patient had multiple comorbidities, including diabetes, hypertension, coronary artery disease, and chronic kidney disease. Additionally, his oxygen saturations were low. Despite these complicating factors, Dr. Doran assessed Patient A as an ASA II, a low-risk patient classification that indicates the patient can receive conscious sedation without

---

[1] According to the VA care center's bylaws, the PSB performs an initial investigation of the patient-safety concerns and makes a recommendation to the MEB. The MEB then convenes a larger panel to review the recommendations.

assistance from the anesthesiology department.[2]  Dr. Doran ordered a sedative dose of 100 micrograms of Fentanyl and 2 milligrams of Versed, administered via a bolus.[3]  This proved to be an excessive amount of medication—Patient A quickly became unresponsive, and the emergency code blue was called.

There is conflicting evidence of what occurred during the code blue.  Although Dr. Doran asserts that she gave several oral orders for Narcan (the reversal agent for Fentanyl), no other witnesses, including the nurses in the room with Dr. Doran, heard her oral orders.  Nurse Alison Kirkpatrick, who responded to the code blue, testified before the AIB that "I looked at Dr. Doran and I said 'Did you give narcotic?' And she gave a little shake of her head, and she couldn't answer me.  I did not hear her order a narcotic reversal.  I did not hear her ask for naloxone, Narcan, nothing." (A.R. 462.)

Later, Dr. Doran made several attempts to supplement the record to reflect that she did, in fact, order Narcan during the code blue.  She asked the licensed practical nurse in the case, Kristen Farrand, to write a statement that Dr. Doran had ordered Narcan.  Nurse Farrand refused because she had not actually heard Dr. Doran order the reversal agent.  On March 20, 2015, after the PSB issued its recommendations and a few days before the case would be reviewed by the AIB, Dr. Doran inserted an addendum to the patient's record listing four specific times she orally ordered that Narcan be given to the patient.  Dr. Doran asked Janet Gerkin, the registered nurse in the case, to cosign the note, but she refused.  Finally, Dr. Doran augmented a sedation-reversal-agent report

---

[2] Dr. Doran later explained that she agreed that Patient A was ASA III, but mistakenly labeled him ASA II on his patient chart because her electronic chart program defaults to ASA II.

[3] The record inconsistently states the dosages ordered by Dr. Doran.  The DAB's decision states that Dr. Doran "gave [Patient A] a rapid dose of 100 micrograms of Fentanyl and 2 micrograms of [V]ersed," (A.R. 2303), but the Notice states that she ordered 100 milligrams of Fentanyl and 2 milligrams of Versed.  (A.R. 31.)  However, the testimony before the DAB makes clear that Dr. Doran actually ordered 100 micrograms of Fentanyl and 2 milligrams of Versed.  (A.R. 1613.)

to read that "Narcan was ordered. Discussed with Dr. McKeon and EMS staff. Ultimately it was not given." (A.R. 426–27.)

*Patient B*. On January 27, 2015, the day after Patient A's procedure, Patient B presented for an EGD. Patient B was a 65-year-old man with multiple complicating factors including cirrhosis, sleep apnea, atrial fibrillation, diabetes, retinopathy, chronic renal failure, and clinical obesity. The procedure was "markedly prolonged," lasting more than 75 minutes, after which Patient B's abdomen was "hard and distended." (A.R. 1.) According to Dr. Borchers' PSB testimony, 75 minutes is an excessive length of time to subject a patient to the discomfort of the procedure. Patient B was later sent to an urgent-care facility to check for an accidental perforation of the stomach during the EGD, but a CT scan revealed there was no perforation. Dr. Doran maintained that the distention of Patient B's abdomen was simply due to air trapped in his small bowel.

*Patient C*. Dr. Doran performed a colonoscopy on Patient C on October 17, 2014. During the procedure, Dr. Doran found "a large tumor in the ascending colon as well as multiple other significant polyps." (A.R. 2.) Despite the possibility that a total colectomy would be required, obviating the need for further procedures, Dr. Doran attempted to remove all of the polyps. This "markedly prolonged the procedure and increased the patient's risk of hemorrhage." (A.R. 2–3.)

*Patient D*. On June 20, 2014, Dr. Doran performed a sigmoidoscopy and anal tattooing with methylene blue on Patient D. Anal tattooing is not part of the core privileges for a gastroenterologist at the Columbus VA. After the procedure, Patient D experienced significant edema and was treated at a private hospital. Dr. Doran later approached a staff member who had assisted in the procedure and requested that he write a statement that Patient D was "prepped before

the administration of the blue dye used on the patient." (A.R. 835.) The staff member was uncomfortable writing the statement because the procedure had taken place nearly a year before.

## B. Internal Reviews

Based on these findings, the Notice listed four charges against Dr. Doran. Charge 1 alleged failures to provide the appropriate standard of care to Patient A, Patient B, and Patient C. Charge 1, Specification 1 concerns Patient A. Charge 2, Specification 2 concerns Patient B. Charge 1, Specification 3 concerns Patient C. Charge 2 alleged a lack of candor in Dr. Doran's testimony during several administrative hearings in which she stated that she gave orders for Narcan to be administered to Patient A during the code blue. Charge 2 also referenced Dr. Doran's attempts to enlist nurses to write statements that Dr. Doran had called for Narcan. Charge 3 alleged inappropriate and untimely documentation in Patient A's record. Charge 4 claimed that Dr. Doran performed the anal tattooing procedure on Patient D without the appropriate privileges.

Dr. Doran responded to the Notice through counsel on July 22, 2015. With respect to Charge 1, Dr. Doran argued that she met the standard of care as to Patients A, B, and C. Dr. Doran asserted that, even considering his complicating medical conditions, Patient A was a candidate for moderate sedation and did not require monitored anesthesia care (MAC), and the dose of Fentanyl she used was appropriate given Patient A's weight, age, high blood pressure, and level of anxiety. Regarding Patient B, Dr. Doran asserted that the procedure was prolonged only because she responded to oozing from a polyp-removal site that was exacerbated by Patient B's liver disease. Dr. Doran maintained that the procedure was only as long as necessary given the complicating factors and the procedures needed to ensure no future bleeding. As to Patient C, Dr. Doran disputed the conclusion that a total colectomy was required, and asserted that her decision to excise the polyps was appropriate.

Regarding Charges 2 and 3, Dr. Doran maintained that she did, in fact, order Narcan during the code blue for Patient A. Dr. Doran also asserted that her requests to enter records clarifying her Narcan order were not improper and were fully authorized by VA policies.

As to Charge 4, Dr. Doran stated that she believed that Patient D's anal tattooing procedure was within her privileges as a gastroenterologist. She added that her supervisor commended her performance after the procedure and did not raise a privileging or practice issue until roughly seven months later, after Patient A's code blue.

Finally, Dr. Doran argued that in light of the factors set forth in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981), the punishment of removal and revocation of privileges was overly severe.[4] Specifically, Dr. Doran asserted that: (1) the generally minor nature of patients' negative outcomes, (2) her strong relationships with her patients, (3) the absence of any

---

[4] The *Douglas* factors include:

(1) The nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or inadvertent, or was committed maliciously or for gain, or was frequently repeated;

(2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position;

(3) the employee's past disciplinary record;

(4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability;

(5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties;

(6) consistency of the penalty with those imposed upon other employees for the same or similar offenses;

(7) consistency of the penalty with any applicable agency table of penalties;

(8) the notoriety of the offense or its impact upon the reputation of the agency;

(9) the clarity with which the employee was on notice of any rules that where violated in committing the offense, or had been warned about the conduct in question;

(10) potential for the employee's rehabilitation;

(11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment, or bad faith, malice or provocation on the part of others involved in the matter; and

(12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others.

*Douglas*, 5 M.S.P.B. at 332.

prior disciplinary record, (4) her exemplary work record, and (5) the adequacy and efficacy of alternative sanctions all mitigate in favor of a lighter punishment.

Keith Sullivan, the Director of the Columbus VA, reviewed the charges against Dr. Doran, the evidence presented in previous hearings, and her written replies. Director Sullivan also "considered other factors including [her] years of service, [her] past work record, the seriousness of the offense(s) with which [she has] been charged, and whether there are any mitigating or extenuating circumstances which would justify mitigation of the proposed penalty." (A.R. 171.) Director Sullivan "concluded that the sustained charge(s) against [her] are of such gravity that mitigation of the proposed penalty is not warranted, and that the penalty of removal is appropriate and within the range of reasonableness." (*Id.*) Effective August 21, 2015, Dr. Doran was removed from VA employment.

## C.     Disciplinary Appeals Board

Pursuant to 38 U.S.C. § 7461, Dr. Doran appealed her termination to the VA Under Secretary for Health. Dr. Doran contended that the prior proceedings violated her right to due process because she was not given effective notice of "any specific law, regulation, policy, procedure, practice or other specific instruction that has been violated with respect to each charge," and because she was never given a written statement of the definition of "standard of care," she was unable to properly prepare a defense. (A.R. 948 (emphasis omitted).) Dr. Doran also asserted that the MEB relied on unrecorded testimony that Dr. Doran was unable to review, and that she was therefore unable to respond to all of the evidence against her. Finally, Dr. Doran argued that she was denied the opportunity to review the VA medical records of other practitioners to determine if they managed similar patients' care under similar circumstances.

The Under Secretary appointed a Disciplinary Appeals Board (DAB, or Board) to review the termination of Dr. Doran's employment, consisting of Dr. Ciaran O'Hare, former Chief of Surgery at the Oklahoma City VA; Dr. Yasser Sakawi, Chief of Anesthesia at the Birmingham, Alabama VA; Dr. Joseph Pisegna, Chief of Gastroenterology at the VA Greater Los Angeles Health Care System; and Angela Madtes, Assistant HR Officer at the Pittsburgh VA. The DAB hearing took place in Columbus, Ohio, on January 25 and 26, 2016. Fourteen witnesses testified, including Dr. Doran, the nurses present during the relevant procedures, and Dr. Doran's supervisors and colleagues at the Columbus VA. The DAB independently reviewed the testimony from the MEB and AIB, the expert submissions from Dr. Doran, factual findings and recommendations from previous reviews, Dr. Doran's prior proficiency reports, and the relevant patient files. Dr. Doran was represented by counsel, who had the opportunity to cross-examine the witnesses.

The DAB issued a decision on March 21, 2016, sustaining Charge 1, Specification 1 and Charge 3, and affirming the termination of Dr. Doran's employment at the VA. The DAB did not sustain Charge 1, Specification 2; Charge 1, Specification 3; Charge 2; or Charge 4.

Regarding Charge 1, the DAB found:

Neither Dr. Doran's clinic note, nor her pre-procedure note gave indication that she analyzed or appreciated the severity of the potential airway difficulties in patient A. Dr. Doran failed to recognize the severity of his health condition in spite of nurses raising concern about his preoperative oxygen saturation and blood pressure and rated him ASA 2 instead of ASA 3. Irrespective of her assessment, the method of sedation was reckless and dangerous and led directly to the airway collapse. Once the emergency occurred, Dr. Doran performed poorly. She did not assume charge nor give clear instruction, did not call for assistance, could not ventilate with the Ambu Bag, and did not clearly ask for reversal agents at the beginning of the event.

Dr. Doran initiated the emergency, but is not completely responsible for the consequences. Critically, the reversal agents had been moved from a readily accessible locked drawer to an Omnicell system, hindering and delaying access to them. By the time Nurse Gerkin presented Flumazenil to Dr. Varma 3-5 minutes

had passed[,] and anesthesia was already there to secure an airway. Nurse Gerkin should have been familiar with the agent and Omnicell access. Dr. Borchers and Dr. Cooperman both agree that if Narcan had been given quickly the consequences were likely to have been much less.

(A.R. 2303 (internal record citations omitted).) The DAB's decision on Charge 1, Specification 1 was unanimous.

Regarding Charge 3, which involved Dr. Doran's addendum to Patient A's file specifying the times that she ordered Narcan and her related request for Nurse Gerkin to cosign the addendum, the DAB found:

> The timing and the content of the note are not disputed. The note contained a very specific timed series of events that included Dr. Doran requesting Narcan on several occasions. Delayed entries in the Medical Record are acceptable, though they are discouraged as they are liable to contain inaccuracies. The electronic record cannot, except by technical means, be legally "spoiled" (altered) as prior entries are not removed. Dr. Doran followed recommended guidelines for delayed entries. They must be dated, signed, reference the original entry, and the reason for their need be explained.

> However, there is still an obligation that they be relevant and accurate. Dr. Doran entered a self-serving statement in the medical record, 6 weeks after the events took place and 3 days after the MEB voted to suspend her privileges. It was also clear that the motivation for placing the note was not to enhance the record but to establish Dr. Doran's version of what took place. The patient's chart is an inappropriate place to place this documentation. Dr. Doran also had a responsibility to the Agency to refrain from actions that would damage its position after the institutional disclosure.

(A.R. 2307–08.) Charge 3 was sustained in full by Dr. Sakawi and in part by Dr. O'Hare and Dr. Pisegna.[5]

Having sustained Charge 1, Specification 1 and Charge 3, the DAB evaluated the appropriateness of Dr. Doran's punishment. The DAB determined that several of the *Douglas* factors weighed in favor of termination: the seriousness of the offense, the employee's position,

---

[5] Dr. Sakawi would have sustained Charge 3 on the additional basis that documenting the medical record six weeks after the events took place is "grossly inappropriate." (A.R. 2314–15.)

the erosion of supervisory confidence, and the lack of potential for rehabilitation. However, the Board found that two factors—prior discipline and prior work record—weighed in Dr. Doran's favor. The DAB noted that Dr. Doran's earlier performance evaluations had been positive.

In spite of this history, the DAB concluded that Dr. Doran's treatment of Patient A "was so removed from the standard of care [that] the penalty of discharge is warranted." (A.R. 2310). The DAB also determined that the sustained charges "represent substandard care, professional incompetence or professional misconduct," and are therefore reportable to the National Practitioner Data Bank. (A.R. 2311.)

The DAB noted, however, that it "had concerns with some aspects of how the Agency formulated and decided the charges." (A.R. 2299.) Specifically, the DAB took issue with Dr. Borchers's statements before the PSB and the MEB, which they found to include "exaggerations or misrepresentations, and were different from his statements under oath." (*Id*.) The Board also noted that the internal review of Patient A's code blue did not address how the relocation of the Narcan from a locked drawer to an automated dispensing system affected the events. The Board found as well that the composition of the AIB was in violation of VA directives because it was "likely to contain members who had direct involvement in the [matter] being investigated," therefore compromising its objectivity, and because it "did not contain members with sufficient knowledge of the subject matter." (A.R. 2300.) Nevertheless, "the Board was satisfied that it had gathered all the evidence it required to make a fair decision, and that Dr. Doran had been afforded due process." (A.R. 2299.)

Dr. Doran then appealed the DAB decision to the district court, arguing that the DAB's decision was arbitrary and capricious, failed to meet the statute's procedural requirements, was unsupported by substantial evidence, and failed to properly evaluate her termination under the

*Douglas* factors. The district court granted summary judgment to Defendants and Dr. Doran appeals.

## II. STANDARD OF REVIEW

We review de novo a district court's opinion as to an agency action. *Fligiel v. Samson*, 440 F.3d 747, 750 (6th Cir. 2006) (citation omitted). We then "apply the appropriate standard of review in looking at the agency's decision." *Id*. (citation and internal quotation marks omitted).

Our review of the DAB's final action is governed by 38 U.S.C. § 7462(f)(2), which provides:

> In any case in which judicial review is sought under this subsection, the court shall review the record and hold unlawful and set aside any agency action, finding, or conclusion found to be—
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> (B) obtained without procedures required by law, rule, or regulation having been followed; or
> (C) unsupported by substantial evidence.

38 U.S.C. § 7462(f)(2). For purposes of § 7462(f)(2)(A), an agency's decision is "arbitrary and capricious" if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Taylor v. Principi*, 92 F. App'x 274, 276–77 (6th Cir. 2004) (quoting *Henry Ford Health Sys. v. Shalala*, 233 F.3d 907, 911 (6th Cir. 2000)). "Although the court may not supply a reasoned basis for the agency's action that the agency itself has not given, a decision of less than ideal clarity should be upheld if the agency's

path may reasonably be discerned." *Id*. at 277 (citing *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1355 (6th Cir. 1994)).[6]

Under § 7462(f)(2)(C), we must set aside any agency action "unsupported by substantial evidence." "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Mountain States Contractors, LLC v. Perez*, 825 F.3d 274, 279 (6th Cir. 2016) (citation omitted). "It is less than a preponderance of the evidence, but more than a scintilla." *Id*. (citation omitted).

### III. DISCUSSION

On appeal, Dr. Doran contends that the DAB's decision was not supported by substantial evidence and that its affirmance of her termination was arbitrary and capricious. Dr. Doran also argues that the actions taken by the VA violated its own procedural rules, denying her due process.

#### A.     Substantial Evidence

*Charge 1, Specification 1.* Dr. Doran first argues that the DAB erred in finding that she violated the standard of care in her treatment of Patient A because there was no evidence that she administered an excessive amount of sedation. Dr. Doran points to the peer reviews she submitted to the PSB that suggest that the 100-microgram dose of Fentanyl she gave was an acceptable exercise of medical discretion. As Dr. Agrawal testified before the DAB, there is no strict guideline mandating that an ASA III patient should receive MAC sedation, and "[i]t is usually a physician and patient choice." (A.R. 1757.) Dr. Agrawal additionally testified that "the dosing for fentanyl 100 was a little high in my opinion," but also suggested that it was not necessarily

---

[6] We have not interpreted the arbitrary-and-capricious standard of 38 U.S.C. § 7462(f) in a published opinion, but the standard of review mirrors the standard of review of administrative actions under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2).

against the guidelines. (A.R. 1754.) Dr. Varma, the anesthesia reviewer on the PSB, similarly stated:

> I am not aware of any hard criteria in the community mandating that a patient with these comorbidities may not undergo moderate sedation. . . . The decision to include an anesthesia provider would be based on the proceduralist's evaluation of the total patient and any concerns that they could not provide safe sedation with their skill-set. In this case, an exam showing MPII, obesity, and sleep apnea might encourage some providers to ask for anesthesia care, but this is a case by case decision.

(A.R. 304–05.)

However, there was also evidence that the dose Dr. Doran administered was excessive given Patient A's particular circumstances. Nurses Farrand and Gerkin testified that Dr. Doran failed to recognize the severity of the patient's health condition in spite of concerns raised about his preoperative oxygen saturation, and incorrectly labeled him an ASA II instead of ASA III. Dr. Doran admitted that her assessment was rushed and that her documentation was inaccurate.

Nurse Gerkin confirmed the doses of the sedatives that Dr. Doran ordered and several doctors testified that this dose was excessive. The Chief of Physical Medicine at the Columbus VA, Dr. Andrew Iams, testified that "in our review of the literature that [sic] the dose of the Fentanyl seemed high in comparison to what would have been a usual dose or at least starting at that dose seemed to be of concern to us." (A.R. 1549.) Dr. Borchers stated that administering this combination of sedatives to an ASA III could cause the patient to "stop breathing, they could become hypoxic, which could then lead to their heart stopping." (A.R. 1793.) According to Dr. Borchers, the appropriate procedure would have been to order MAC anesthesia administered by an anesthesiologist: "You would have two doctors in the room. The anesthesiologist would control the anesthesia, would most likely use propofol, and propofol's short acting. If anything occurred, you stop giving the propofol and the patient's respiratory status would improve rapidly." (A.R.

1795.) Dr. Steve Wanamaker testified that the delivery of drugs as a bolus, as was done by Dr. Doran, increases the risk to the patient, particularly in patients with multiple co-morbidities. Dr. Wanamaker, who was on the PSB Panel, explained that in the case of Patient A, "[the patient] received a significant dose of Fentanyl and Versed as a bolus administration and that the subsequent cardiovascular collapse was secondary to the administration of those two drugs in close proximity." (A.R. 1613.)

The Board also considered the transcripts of prior reviews of Dr. Doran's conduct. Dr. Varma stated during the PSB panel that, given Patient A's sleep apnea and obesity, "when the sedation was started I would have gone very gentle to start with . . . as recorded, patient was given two of Versed and 100 of Fentanyl upfront. And I think to me, my understanding is, that led to the sequence of all the problems." (A.R. 641.) Dr. Iams, a gastroenterologist on the PSB panel, concluded that Dr. Doran's care "did not meet the community standards[,] especially because [the] patient had multiple co-morbidities" and sleep apnea. (A.R. 304.) This evidence is more than sufficient to support the Board's conclusion that "the method of sedation was reckless and dangerous and led directly to the airway collapse." (A.R. 2303.)

Dr. Doran also argues that there was no reliable evidence that Patient A experienced an extended hospitalization after the code blue or that he subsequently filed a tort claim against the VA, facts which the DAB considered in upholding Dr. Doran's termination. However, Dr. Cooperman testified before the DAB that he received "regular updates at morning report on patients that are—patients of ours that are hospitalized at private hospitals from our utilization review nurses or navigation nurses, and so we received daily updates on Patient A's condition until the time that he was transferred to a nursing facility." (A.R. 2006–07.) These updates included information regarding the patient's clinical condition, his location, if he needed surgery, or any

other significant change. Dr. Cooperman further stated that it was his understanding that Patient A "was in the ICU for approximately 30 days. . . . [A]fter reviewing the case and getting outside review, we did an institutional disclosure to his wife, and she has filed a tort claim for $3 million against the Agency." (A.R. 1972.) Similarly, Director Sullivan testified, "I know the patient was in critical care for quite a long time and ended up in a nursing home, and I don't believe he was in a nursing home before he came to us for the procedure. So it was a serious incident." (A.R. 2054.) Although this evidence is hearsay, "[h]earsay evidence is admissible in an administrative proceeding, provided it is relevant and material." *Myers v. Sec'y of Health & Human Servs.*, 893 F.2d 840, 846 (6th Cir. 1990) (citing *Richardson v. Perales*, 402 U.S. 389, 400 (1971)). As the district court properly noted, these statements were derived from regular reports used to track patients, and therefore bear some indicia of reliability.

*Charge 3*. The DAB also sustained Charge 3, which alleged that Dr. Doran inserted an addendum to Patient A's file, long after Patient A was discharged from Dr. Doran's care, in which Dr. Doran listed specific times that she asked for Narcan. Dr. Doran argues on appeal that the DAB's rejection of Charge 2[7] precludes the DAB from sustaining Charge 3, because the DAB "already decided that there was no dishonesty surrounding the Narcan order; therefore, the record entry was accurate." (Appellant Br. at 35.)

As the DAB explained, however, Dr. Doran's addendum was inappropriate without regard to its accuracy:

> Dr. Doran entered a self-serving statement in the medical record, 6 weeks after the events took place and 3 days after the MEB voted to suspend her privileges. It was also clear that the motivation for placing the note was not to enhance the record but

---

[7] Charge 2 alleges that Dr. Doran lacked candor in stating to the PSB that she had, in fact, ordered Narcan. The DAB did not sustain Charge 2 because it found there was a possibility that Dr. Doran ordered the Narcan, albeit ineffectively. "The Board accepts that Dr. Doran did not give a clearly audible order for drugs, and when asked to clarify she only mentioned Flumazenil and not Narcan, but it cannot consider proven that she never requested them at all, therefore the charge of lack of candor is not proven." (A.R. 2306.)

> to establish Dr. Doran's version of what took place. The patient's chart is an inappropriate place to place this documentation. Dr. Doran also had a responsibility to the Agency to refrain from actions that would damage its position after an institutional disclosure.

(A.R. 2308.) The DAB determined that, whether or not Dr. Doran actually ordered the Narcan, her belated documentation in Patient A's records was inappropriate, and therefore the DAB did not err in sustaining Charge 3 without conclusive evidence that Dr. Doran's addendum was untruthful.

## B. Arbitrary and Capricious

Dr. Doran next argues that the DAB failed to appropriately consider the twelve factors set out in *Douglas v. Veterans Administration*, 5 M.S.P.B. 313 (1981), in evaluating her punishment. Specifically, Dr. Doran argues that the DAB failed to give sufficient weight to the first factor (the nature and seriousness of the offense), because there was no clear evidence that Patient A sustained long-term damage; the third factor (past disciplinary record) and fourth factor (employee's past work record), because the DAB merely noted that there was no prior discipline in Dr. Doran's record; the eighth factor (notoriety), because there was no evidence of Plaintiff A's tort claim introduced into the record; the ninth factor (the clarity with which the employee was on notice or had been warned), which the DAB did not address; the tenth factor (the potential for rehabilitation), because Director Sullivan testified that he believed that Dr. Doran could be rehabilitated; the eleventh factor (mitigating circumstances), because the DAB did not consider Dr. Borchers's alleged harassment of Dr. Doran; and the twelfth factor (the adequacy and effectiveness of alternative sanctions), because the DAB failed to consider it. Dr. Doran also argues that the DAB's failure to consider mitigating circumstances constitutes an abuse of discretion, warranting reversal.

An appellate court will uphold the penalty chosen by the DAB so long as the DAB "examined the relevant data and articulated a satisfactory explanation for its decision, including a

rational connection between the facts and the decision made." *Kreso v. McDonald*, 631 F. App'x 519, 523–24 (10th Cir. 2015) (citing *MacKay v. DEA*, 664 F.3d 808, 817 (10th Cir. 2011)).

While a lesser sanction may also have been appropriate, we cannot say that the DAB's decision to sustain Dr. Doran's termination was arbitrary or capricious. The Board expressly considered nine of the *Douglas* factors, devoting to each an appropriately detailed discussion of how the factor affected the Board's ultimate decision. For example, the DAB explained that Dr. Doran's breach of the standard of care was a serious offense because she failed to assess the relevance of Patient A's comorbidities to her chosen method of anesthesia, and that this breach affected Patient A's long-term health. The DAB found that Dr. Doran's "method of sedation would be dangerous in many patients and it seems to have been chosen without any consideration of the clinical situation." (A.R. 2309.)

The DAB also found that, "[a]s a licensed independent practitioner Dr. Doran must assess patients, perform procedures, and manage any complication competently and without direct supervision." (A.R. 2309.) Her failure to do so in Patient A's case eroded the confidence of her supervisors and exposed the VA to significant tort liability. The DAB additionally evaluated Dr. Doran's potential for rehabilitation and noted that "Dr. Doran had ample opportunity to reflect upon her performance and role in the events under investigation. Her consistent defense was to argue that her actions were correct and to minimize her role in the events." (A.R. 2310.)

On the other hand, the DAB noted that Dr. Doran had no record of prior discipline, and that her past evaluations had been positive. The DAB also remarked that Patient A's code blue was Dr. Doran's single recorded sedation event in six years. The DAB also referenced and considered Director Sullivan's testimony that "I think there is an opportunity for Dr. Doran to

return to work . . . I believe there is a chance that Dr. Doran could be rehabilitated to where she could return to work." (A.R. 2310.)

Ultimately, however, the DAB found that, "despite some mitigating circumstances, the Board votes to sustain the penalty and considers it within the range of reasonableness." (A.R. 2311.) This decision is not "counter to the evidence before the agency, or so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Henry Ford Health Sys.*, 233 F.3d at 911 (quotation omitted).

It is true that the DAB did not address three of the factors—the consistency of the penalty with any applicable agency table of penalties, the adequacy of alternative sanctions, and the clarity with which the employee was on notice that the conduct violated policy. However, as the *Douglas* court noted, "Not all of these factors will be pertinent in every case." 5 M.S.P.R. at 305. *See also Schuck v. Frank*, 27 F.3d 194, 197 n.2 (6th Cir. 1994.) "Although we have repeatedly recognized that the Board need not consider all the *Douglas* factors, it must consider the relevant ones." *Purifoy v. Dep't of Veterans Affairs*, 838 F.3d 1367, 1372 (Fed. Cir. 2016) (citation omitted).

The DAB did not err in failing to discuss two of the *Douglas* factors. First, neither party has suggested that there is an applicable table of penalties, so that factor is not relevant. Second, the DAB discussed the possibility of alternative sanctions at several points in its analysis, for example, by rejecting the notion that Dr. Doran could continue at the Columbus VA under a supervised training program. The DAB reasoned, "[d]iscrepancies brought into question Dr. Doran's ability for rehabilitation, and there was a lack of acknowledgement and ownership of her errors . . . The relationship with her supervisors and co-workers has been damaged, and . . . it is not certain that her performance will improve [or that] trust can be restored." (A.R. 2311.)

Finally, Dr. Doran correctly notes that the DAB did not discuss the clarity-of-notice factor in its evaluation, and this factor would seem to weigh in favor of Dr. Doran. Prior to the PSB, she had not received any warnings regarding patient treatment, and as the DAB stated, her addendum to Patient A's file was technically in compliance with VA policy for delayed entries. Nevertheless, we are not convinced that this factor so outweighs the factors in support of termination as to warrant reversal.

### C. Statutory Due Process

Permanent physicians hired by the VA are entitled to certain procedural protections when they experience a "major adverse action" that is the result of "professional conduct or competence." 38 U.S.C. § 7461–62. These protections include advanced written notice of the charges against the physician, the law violated, and a file containing the evidence supporting each charge; an opportunity to answer the charges and to submit evidence; the right to be represented by an attorney; a written, reasoned decision by the DAB; and the right to judicial review of any adverse decision by the DAB. *Id.* § 7462. Further, "it is an elemental principle of administrative law that agencies are bound to follow their own regulations." *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) (quotation and alteration omitted). However, because our review of administrative agency decisions is subject to harmless-error analysis, "we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Id.* (citations and internal quotation marks omitted).

***Inadequate Notice***. Dr. Doran argues the VA failed to provide adequate notice of the charges against her, in violation of 38 U.S.C. § 7462 (b)(1)(A). Specifically, she asserts that the Notice failed to specify the discrete policies or standards that she is charged with violating. For

example, Dr. Doran notes that the standard of care applicable to a physician is specific to the physician's practice area, and therefore the general statement that she has violated the standard of care fails to provide adequate notice of the charges in this case.

38 U.S.C. § 7462(b)(1) provides that the written notice for a major adverse action must provide the basis for the charge and "a statement of any specific law, regulation, policy, procedure, practice, or other specific instruction that has been violated." The VA Handbook clarifies that, at a minimum, the notice must include statements "of the specific charges upon which the proposed action is based, including names, dates, places, and other data sufficient to enable the employee to fully understand the charges and to respond to them" and "any specific law, regulation, policy, procedure, practice, or other specific instruction (national, local or otherwise) that has been violated as it pertains to the charge(s) *if applicable*). VA Handbook 5021, Part I, Ch. 1 § 5(b) (Apr. 15, 2002) (emphasis added).

The Notice provided Dr. Doran with adequate notice of the charges against her. The Notice included the specific dates, patients, and procedures that gave rise to the charges, identifies persons who witnessed the allegedly inappropriate conduct, and clearly set forth the basis for the charge. For example, Charge 1, Specification 1 explained:

> Based on the patient[']s complex medical history you should have considered initiating the sedation process with lower doses of medication or asking for assistance from Anesthesiology. Instead, you gave him a rapid dose of 100 [micro]grams of Fentanyl and 2 milligrams of versed intravenous push. Given the patient's medical history, this was an excessive amount of medication.

(A.R. 1.) The charge described the action taken by Dr. Doran, why it was inappropriate, and what the correct course of action would have been. Dr. Doran is correct that the charges did not identify a "specific law, regulation, policy, [or] procedure" that Dr. Doran violated, but the Handbook only requires such specification "if applicable." VA Handbook 5021, Part I, Ch. 1 § 5(b). Here, Dr.

Doran was not charged with violating a specific law or regulation—she was charged with breaching the standard of care that lies at the core of medical competency. It was not fatal for the charges to fail to state the *specific* standard of care. Dr. Doran is a gastroenterologist; implicit in the charge is that she violated the standard of care owed by a gastroenterologist in choosing and administering anesthesia by administering, without the assistance of an anesthesiologist, too much anesthesia too quickly to a patient with several health factors. The Notice was more than sufficient to allow Dr. Doran to "fully understand the charges and to respond to them." VA Handbook 5021, Part I, Ch. 1 § 5(b).

Dr. Doran also argues that the DAB violated the VA Handbook by considering her conduct during the code blue in sustaining the charge against her.[8] She contends that Charge 1, Specification 1 is limited to whether she provided excessive medication that resulted in Patient A's extended suffering, and does not allege "substandard care or misconduct in Dr. Doran's performance during the code blue." (Appellant Br. at 22–23.) The applicable charge stated:

> On January 26, 2015, Patient was scheduled for an [EGD] and colonoscopy. This patient had multiple comorbidities, and you assessed him as an ASA II. The procedure was not done under monitored anesthesia care (MAC). Based on the patient[']s complex medical history you should have considered initiating the sedation process with lower doses of medication or asking for assistance from Anesthesiology. Instead, you gave him a rapid dose of 100 [micrograms] of Fentanyl and 2 milligrams of versed intravenous push. Given the patient's medical history, this was an excessive amount of medication. The patient began to desaturate, and became unresponsive. A code blue was called. The patient was critically ill and was hospitalized for over 30 days. He has since been discharged to a nursing home, whereas, previously he was living independently. The third party gastroenterologist and anesthesiologist who reviewed this case were critical of the care you provided.

(A.R. 1.)

---

[8] In support, Dr. Doran cites Part V, Chapter 1 § 8(l)(1), which provides, "In the opening statement, the Chairperson will give a brief summary of the issues set forth in the notice of proposed adverse action." At the opening of the DAB hearing, the parties agreed to waive the reading of the charges after the Chairman agreed that the reading of the charges "would be the same charges that are in the proposed letter." (A.R. 1283.)

Although the charge did not specifically allege that Dr. Doran failed to effectively respond to the emergency, the events during the code blue form the basis for Charge 2 and Charge 3, and thus Dr. Doran was on notice that her conduct during the code blue would be reviewed by the DAB. Further, although the Board's findings on Charge 1 mention and criticize Dr. Doran's failure to take charge during the code blue, the Board's primary finding concerns Dr. Doran's failure to recognize the severity of Patient A's health condition and the "reckless and dangerous" method of sedation.

*Ex Parte Influence*. Dr. Doran argues that Dr. Borchers's involvement with the PSB and the MEB violated the VA's rule against ex parte communications between interested parties and decision-making officials. The Handbook states:

> Officials involved in taking a major adverse action against an employee must observe the prohibitions against improper 'ex parte' communications. Department officials may communicate with each other during the decision-making process; however, it is improper for an interested party (e.g., supervisor, proposing official), to pressure the decision official into making a particular decision. Such communications may support reversal of the action upon appeal.

VA Handbook 5021, Part II, Chapter 1, § 9(h)(8). The Handbook does not otherwise define "ex parte communications." Dr. Doran argues, and the DAB recognized, that Dr. Borchers was a primary source of information provided to Dr. Cooperman, the PSB, and the MEB, and that his statements to the internal hospital review boards contained "exaggerations or misrepresentations." (A.R. 2299.)

We first note that there is no evidence that Dr. Borchers "pressure[d] the decision official" to adopt a particular position. But even if Dr. Borchers's statements in previous proceedings were contrary to VA policy, it is clear that the statements had no effect on the DAB's ultimate decision. Dr. Borchers's misstatements or alleged bias might have influenced the PSB or the MEB, but the Board recognized that those statements were contrary to his testimony before the DAB, and

therefore lacked credibility. "Dr. Doran complained that Dr. Borchers was inaccurate when he presented his summations before the PSB and the MEB, and that they were without foundation. The Board found substance to this complaint. In instances his statements were exaggerations or misrepresentations, and were different from his statements under oath." (A.R. 2299.) As a result, "[h]is presentations should be looked at having consideration that there were personal difficulties between Dr. Borchers and Dr. Doran, and that he had been pursuing a course of progressive discipline against Dr. Doran for the preceding 6 months." (A.R. 2302.)

Accordingly, even if Dr. Doran's misstatements could be construed as improper ex parte communications, the error was harmless because the bias did not affect the DAB's ultimate decision. *See ECM BioFilms, Inc. v. Fed. Trade Comm'n*, 851 F.3d 599, 612 (6th Cir. 2017) (in reviewing an agency's decision, we apply a harmless-error rule such that "a mistake that has no bearing on the ultimate decision or causes no prejudice shall not be the basis for reversing an agency's determination"). The Board conducted its own fact-finding when upholding Dr. Doran's removal.

***Summary Suspension.*** Dr. Doran argues that the summary suspension of her clinical privileges prior to the PSB panel proceedings violated the procedures outlined in the VA Handbook, thereby violating her right to due process. Dr. Doran argues that the VA Handbook provides that clinical privileges may only be suspended when the failure to do so may result in an "imminent danger to the health of any individual," and that the summary suspension of clinical privileges triggers an expedited comprehensive review within 30 days. VA Handbook 1100.19 § 14(1). Dr. Doran asserts that the hospital never made a finding of "imminent danger" to justify the suspension, and that the completion of the two internal reviews—the PSB panel and the MEB—did not occur until 38 and 42 days after the summary suspension. And, because a summary

suspension lasting longer than 30 days is reportable to the National Practitioner Data Bank, Dr. Doran argues that the hospital's failure to adhere to the VHA Handbook has "permanently tarnishe[d] Dr. Doran's professional record on the NPDB." (Appellant Br. at 17.)

This claim is beyond the scope of our review, however. Dr. Doran made no arguments regarding the summary suspension in her response to the Notice, and there was no testimony before the DAB regarding the summary suspension. Nor did the DAB address the claim in its decision. Although Dr. Doran may have been able to challenge the suspension under § 7461, she did not do so. In evaluating the decision of an administrative agency, our "reviewing function is one ordinarily limited to consideration of the decision of the agency or court below and of the evidence on which it was based." *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714–15 (1963). Accordingly, we decline to consider whether Dr. Doran's summary suspension was in violation of her statutory due process rights.

### D. Constitutional Due Process

Finally, Dr. Doran suggests that the errors discussed above amount to a deprivation of her due process rights, citing *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985).[9] In *Loudermill*, recognizing "the severity of depriving a person of the means of livelihood," the Supreme Court held that a state employee is entitled to a hearing prior to termination. *Id*. at 543. This hearing, "though necessary, need not be elaborate." *Id*. at 545. At bottom, "[t]he tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story." *Id*. at 546.

Here, Dr. Doran received the benefit of a two-day hearing before the DAB, during which she had the opportunity to present evidence in support of her case, cross-examine her employer's

---

[9] Dr. Doran does not argue that the VA's statutory scheme for reviewing major adverse events is unconstitutional on its face.

witnesses, make arguments, and explain her position. Although federal rules of evidence and procedure did not apply, the DAB proceedings resembled a judicial trial in most respects. Indeed, Dr. Doran stated at the hearing that she felt she had been accorded due process; when asked if she believed she had a full opportunity to present her side of the case, she responded, "Finally." (A.R. 2295.) The Supreme Court noted in *Loudermill* that "[t]he essential requirements of due process . . . are notice and an opportunity to respond." 470 U.S. at 546. Those requirements were met in this case.

## IV.

For the reasons stated above, we **AFFIRM**.